Hickey v. Government Employees Insurance Company d/b/a GEICO

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

## ALEXANDRIA DIVISION

JOSEPH L. HICKEY III,

    Plaintiff,

v.

GOVERNMENT EMPLOYEES INSURANCE
COMPANY d/b/a GEICO,

    Defendant.

Civil Action No. 1:26-cv-2459-LMB-WEF

COMPLAINT

DEMAND FOR JURY TRIAL

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Joseph L. Hickey III, proceeding pro se, brings this civil action against Defendant Government Employees Insurance Company d/b/a GEICO under Titles I and V of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 et seq., and the Virginia Human Rights Act, Va. Code §§ 2.2-3900 et seq. Plaintiff alleges as follows:

### I. PRELIMINARY STATEMENT

1. This is an ADA employment case about a disabled employee's right to equal access to compete for internal positions, not a demand for an automatic promotion or a waiver of current-job duties.

2. Plaintiff has bipolar disorder, an episodic psychiatric disability that, when active, substantially limits the major life activity of communicating. Consistent with the April 11, 2025 accommodation request from his treating psychiatrist, Plaintiff's episodic mood instability can affect speech patterns, energy levels, and his ability to maintain consistent communication performance, particularly in a high-pressure call-center environment, and may cause occasional communication difficulties reflected in customer-satisfaction surveys. During the relevant period, those disability-related communication difficulties affected Plaintiff's customer-survey scores in his GEICO call-center role.

3. GEICO used a rigid customer-survey metric as both a current-job performance measure and an internal-posting barrier. Plaintiff requested a limited accommodation: that GEICO not use the disability-impacted customer-survey metric as an absolute barrier to applying or posting for non-call-center positions where that metric was not job-related.

4. GEICO maintained an internal mobility system that, on information and belief, allowed case-by-case exceptions to posting prerequisites. Yet when Plaintiff requested a disability-related exception to the survey/posting barrier, GEICO Human Resources categorically told him the survey metric could not be waived for posting out.

Hickey v. Government Employees Insurance Company d/b/a GEICO

5. GEICO later characterized the situation as an ongoing interactive process and argued that Plaintiff did not apply for other positions. But the request itself concerned access to the application process. GEICO cannot leave the process blocked and then fault Plaintiff for failing to apply through that blocked process.

6. After Plaintiff memorialized the categorical denial in writing - while stating that no acknowledgment was necessary - GEICO never corrected the substance of that memorialization or separately told him that the requested survey/posting modification remained under review. GEICO also did not conduct an individualized assessment of Plaintiff's qualifications for non-call-center roles or identify a comparable vacant role. Plaintiff resigned on May 12, 2025, expressly stating that he was resigning because GEICO had provided no meaningful accommodation or interactive process and that he considered the resignation a constructive discharge.

7. GEICO then reported the separation to the Virginia Employment Commission as an ordinary voluntary quit/job-dissatisfaction separation. Plaintiff alleges that this materially false or misleading state-agency report was post-employment retaliation specifically in response to the protected opposition communicated in his May 12 resignation letter: GEICO or its agent acknowledged that a written resignation had been provided, withheld the requested letter, and substituted an ordinary job-dissatisfaction narrative for the letter's express complaints of no meaningful accommodation, no meaningful interactive process, and constructive discharge.

8. This Complaint asserts individual ADA failure-to-accommodate, screen-out, disparate-impact, intentional-discrimination, retaliation, hostile-environment, constructive-discharge, and alternative interference theories. It also asserts supplemental Virginia Human Rights Act claims arising from the same conduct and challenges GEICO's unappealable customer-survey system as applied to Plaintiff.

## II. PARTIES

9. Plaintiff Joseph L. Hickey III is an individual residing in Springfield, Virginia. Plaintiff was employed by GEICO from approximately January 2021 until May 12, 2025.

10. Defendant Government Employees Insurance Company is a private employer doing business as GEICO. On information and belief, GEICO employed far more than fifteen employees at all relevant times and was a covered employer under Title I of the ADA and the Virginia Human Rights Act.

11. On information and belief, Government Employees Insurance Company was Plaintiff's employer and/or acted through integrated GEICO entities, HR personnel, managers, unemployment agents, and corporate representatives. Plaintiff reserves the right to amend the caption or add related GEICO entities if discovery shows another GEICO entity was also Plaintiff's employer or joint employer.

12. GEICO may be served through its registered agent identified in the Virginia State Corporation Commission's records or at any other proper service address. The relevant workplace was GEICO's Stafford County office at or near One GEICO Boulevard, Fredericksburg, Virginia 22406.

## III. JURISDICTION, VENUE, AND EXHAUSTION

13. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the ADA, 42 U.S.C. §§ 12101 et seq. The Court also has jurisdiction under 42 U.S.C. § 12117(a), which incorporates Title VII's enforcement procedures.

Hickey v. Government Employees Insurance Company d/b/a GEICO

14. This Court has supplemental jurisdiction over Plaintiff's Virginia Human Rights Act claims under 28 U.S.C. § 1367(a) because those claims arise from the same common nucleus of operative facts as the ADA claims and form part of the same Article III case or controversy.

15. Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3), incorporated by 42 U.S.C. § 12117(a), because the unlawful employment practices occurred in Virginia, relevant employment records are maintained in Virginia, Plaintiff resided and worked in Virginia, and GEICO conducts business in this District.

16. On information and belief, the events at 1 GEICO Boulevard in the Fredericksburg, Virginia area occurred in Stafford County, which is assigned to the Alexandria Division of this Court. To the extent the Court determines another division is appropriate, Plaintiff respectfully requests transfer within the Eastern District rather than dismissal.

17. Plaintiff filed EEOC Charge No. 570-2025-02807 alleging disability discrimination and retaliation. The amended charge alleged denial of accommodation, hostile work environment, constructive discharge, disparate impact, disparate treatment, and retaliation, including GEICO's May 29, 2025 VEC submission.

18. Plaintiff's formal charge and amended charge were presented to both the EEOC and the Virginia Office of Civil Rights, named GEICO as the respondent, identified disability and retaliation, and requested filing with both agencies. The amended charge expressly alleged failure to engage in a good-faith interactive process, denial of equal access to compete for non-call-center positions, the hostile meeting with Danny Iwuji, pressure to resign or accept a lower-paid demotion while the accommodation request was pending, disability-minimizing comments, disability discrimination, constructive discharge, and retaliation.

19. The EEOC issued a Determination and Notice of Rights on May 29, 2026. EEOC portal activity reflects that Plaintiff downloaded and received the Notice on May 29, 2026. This Complaint is filed within ninety days of receipt. The EEOC Notice also serves as a notice of the right to file a civil action under Va. Code § 2.2-3907(I), and the Virginia Human Rights Act claims are timely under Va. Code § 2.2-3908(A). A copy of the Notice is attached as Exhibit A.

20. To the extent GEICO contends that any allegation differs in wording from the EEOC charge, Plaintiff alleges the claims here are reasonably related to the charge and would have followed from a reasonable administrative investigation. See Sydnor v. Fairfax Cnty., 681 F.3d 591, 594-95 (4th Cir. 2012).

## IV. RELEVANT LEGAL PRINCIPLES

21. The ADA prohibits discrimination against a qualified individual on the basis of disability in job application procedures, hiring, advancement, discharge, compensation, training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

22. A qualified individual is one who, with or without reasonable accommodation, can perform the essential functions of the employment position the individual holds or desires. 42 U.S.C. § 12111(8); Reyazuddin v. Montgomery Cnty., Md., 789 F.3d 407, 414-16 (4th Cir. 2015).

23. Reasonable accommodation includes job restructuring, modified schedules, reassignment to a vacant position, and appropriate adjustments or modifications of examinations, training materials, policies, application processes, or similar criteria. 42 U.S.C. § 12111(9); 29 C.F.R. § 1630.2(o). A

Hickey v. Government Employees Insurance Company d/b/a GEICO

reasonable accommodation should provide meaningful equal employment opportunity. Reyazuddin, 789 F.3d at 416.

23A. Intentional disability discrimination also includes limiting or classifying an employee in a way that adversely affects employment opportunities or status because of disability. 42 U.S.C. § 12112(b)(1). Disability-focused assumptions may support an inference of discriminatory intent when an employer generalizes from a medical condition to perceived incapacity for a category of work instead of assessing the individual's actual abilities. See Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 302-03 (4th Cir. 1998) (affirming an ADA demotion verdict supported by decisionmakers' assumptions about the employee's medical condition and capacity for supervisory work).

24. The Fourth Circuit recognizes that the interactive process must be conducted in good faith. Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 581 (4th Cir. 2015). The interactive process is not an end in itself; it matters because it identifies the precise limitation and effective accommodations. See Wilson v. Dollar Gen. Corp., 717 F.3d 337, 346-47 (4th Cir. 2013); Tarquinio v. Johns Hopkins Univ. Applied Physics Lab, 141 F.4th 568 (4th Cir. 2025).

25. The ADA prohibits qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test, or criterion is job-related for the position in question and consistent with business necessity. 42 U.S.C. § 12112(b)(6); 29 C.F.R. § 1630.10. In EEOC v. Randstad, 685 F.3d 433 (4th Cir. 2012), the Fourth Circuit recognized ADA investigation into job criteria alleged to screen out a disabled individual.

26. The ADA does not require automatic promotion or automatic placement over better-qualified applicants. See Elledge v. Lowe's Home Ctrs., LLC, 979 F.3d 1004 (4th Cir. 2020). Plaintiff does not seek automatic reassignment. Plaintiff alleges he was denied equal access to compete because GEICO kept a disability-impacted metric as an absolute posting barrier and refused individualized case-by-case consideration.

27. An employee who does not submit a formal application may still proceed where application would have been futile because of the employer's discriminatory practice. See Brown v. McLean, 159 F.3d 898, 902-03 (4th Cir. 1998). Plaintiff alleges GEICO's own categorical denial made internal applications futile unless the disability-impacted posting barrier was modified.

28. The ADA prohibits retaliation against an individual because the individual opposed practices made unlawful by the ADA or participated in ADA proceedings. 42 U.S.C. § 12203(a). A request for accommodation is protected activity, and protected opposition may be communicated internally without waiting to file a formal charge. Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 577-78 (4th Cir. 2015); DeMasters v. Carilion Clinic, 796 F.3d 409, 417 (4th Cir. 2015). A materially adverse act is one that might dissuade a reasonable worker from making or supporting a charge of discrimination. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). In the Fourth Circuit, pretext can support but-for causation at the retaliation stage. Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 252 (4th Cir. 2015). Post-employment legal or administrative conduct may be materially adverse where it is retaliatory. See Darveau v. Detecon, Inc., 515 F.3d 334, 343-44 (4th Cir. 2008); Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997).

29. The Fourth Circuit recognizes hostile-work-environment claims under the ADA. Fox v. Gen. Motors Corp., 247 F.3d 169, 177 (4th Cir. 2001). The elements include disability, unwelcome

harassment, harassment based on disability, severe or pervasive conduct, and a basis for imputing liability to the employer. Jessup v. Barnes Grp., Inc., 23 F.4th 360, 367-69 (4th Cir. 2022).

30. Constructive discharge occurs when discriminatory working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign. Pa. State Police v. Suders, 542 U.S. 129, 141 (2004). A constructive-discharge claim accrues only after an employee resigns, and the limitations period begins when the employee gives notice of resignation. Green v. Brennan, 578 U.S. 547, 555, 564 (2016).

31. The Virginia Human Rights Act prohibits an employer from discriminating because of disability in compensation, terms, conditions, or privileges of employment; from limiting or classifying employees or applicants in a way that deprives or tends to deprive employment opportunities because of disability; and from using disability as a motivating factor in an employment practice. Va. Code § 2.2-3905(B)(1)(a)-(b), (6).

32. Virginia law separately makes it unlawful to refuse reasonable accommodation to known mental impairments, take adverse action against an employee who requests or uses accommodation, deny employment or promotion opportunities because accommodation would be required, or fail to engage in a timely, good-faith interactive process and discuss alternative accommodations. Va. Code § 2.2-3905.1(B)(1)-(3), (5).

## V. FACTUAL ALLEGATIONS

**A. Employment, Disability, Medical Notice, and Performance Context**

33. Plaintiff began working for GEICO in approximately January 2021 as a call-center employee and later worked as a Customer Service Associate / Service Representative in GEICO's Fredericksburg-area office.

34. Plaintiff performed many aspects of the role successfully. He was promoted to Service Representative IV in or around 2023. Once he became proficient in the position, he excelled at productivity measures such as Average Handling Time / Calls Per Hour.

35. Plaintiff holds a Master's degree in Business Management and was qualified to compete for non-call-center GEICO roles, including analytical, administrative, underwriting, internet, executive assistant, back-office, or other roles where a call-center customer-survey metric was not job-related.

36. Plaintiff has bipolar disorder. During the relevant period, Plaintiff's bipolar disorder was active and caused or exacerbated symptoms including involuntary tics, pressured speech, distractibility, insomnia, and communication manifestations that could affect how customers perceived Plaintiff and responded to surveys.

37. Plaintiff's disability is episodic. A condition may be substantially limiting when active even if it is not continuously limiting. Plaintiff alleges his bipolar disorder substantially limited major life activities when active.

38. By July 2024, GEICO had notice of Plaintiff's mental-health condition through GEICO's leave/FMLA or i-Sight processes. Plaintiff later sought ADA accommodation in March and April 2025 when disability-related symptoms affected the customer-survey metric and internal mobility.

39. In a 2024 self-evaluation, Plaintiff initially identified bipolar disorder as the cause of survey-related difficulty, but his supervisor instructed him to replace that explicit disability reference with

Hickey v. Government Employees Insurance Company d/b/a GEICO

vague language such as 'personal issues outside my control.' Plaintiff alleges this sanitized the performance record and later allowed GEICO to characterize a disability-related issue as ordinary performance.

40. Plaintiff's self-evaluations did not state that he was unable to interact with customers. To the contrary, Plaintiff described strengths in customer connection, problem-solving, empathy, call navigation, and technical productivity. Plaintiff acknowledged survey difficulties but did not concede global inability to perform customer-facing work.

40A. In its EEOC Position Statement, GEICO argued that Plaintiff "suggests that he was unable to interact with customers (an essential function of his position), either with or without reasonable accommodation," and relied on that characterization to contend that Plaintiff was not qualified. GEICO Position Statement at 5. GEICO did not quote Plaintiff making that concession, and the charge GEICO cited did not contain it.

40B. Plaintiff made no such global assertion. His treating psychiatrist described occasional disability-related communication difficulties reflected in customer surveys, explained that survey fluctuations might not accurately reflect Plaintiff's overall capabilities or professional potential, and expressly limited the requested posting modification so that it did not apply to Plaintiff's current position. Plaintiff challenged a disability-sensitive measurement and sought access to the application process for other positions; he did not claim an inability to perform customer-facing work with or without accommodation.

40C. Plaintiff alleges that GEICO's formulation was deliberately overbroad, blame-shifting, and pretextual. It converted an episodic disability's effect on a blunt customer-perception instrument into a supposed global incapacity; collapsed the distinction between deficient service and a customer's adverse reaction to disability-linked speech, tone, pace, affect, tics, or psychiatric presentation; and shifted responsibility from GEICO's decision to give those unreviewed reactions employment force onto Plaintiff's supposed inability to serve customers.

40D. The distinction is central: the alleged problem was not that Plaintiff could not interact with customers. It was that customers could react adversely to protected disability manifestations and GEICO, through an excellent-only threshold, no meaningful bias review, and job and application consequences, ratified any such bias by converting it into GEICO's own employment action. GEICO possessed Plaintiff's medical documentation and actual request, as well as the survey records and recorded calls. A factfinder could infer from GEICO's contrary formulation a deliberate distortion rather than a good-faith misunderstanding.

**B. GEICO's Customer-Survey System and Internal Mobility Barrier**

41. GEICO used a strict numerical evaluation system for call-center associates. Plaintiff alleges that customer surveys accounted for approximately fifty percent of an employee's overall performance score, while the remaining portion was based on metrics such as Average Handling Time or productivity.

42. The survey scale included ratings such as poor, fair, good, very good, and excellent. GEICO treated anything below 'excellent' as functionally failing for purposes of the relevant survey metric.

43. Employees with fewer than approximately 77 percent 'excellent' survey ratings were subject to job jeopardy, ranking consequences, discipline, internal-mobility restrictions, and potential rolling termination decisions.

Hickey v. Government Employees Insurance Company d/b/a GEICO

44. GEICO publicly ranked employees against each other on a floor-wide leaderboard and, on information and belief, conducted recurring rolling terminations or termination reviews affecting the bottom 10 percent to 25 percent of employees over six-month intervals.

45. Customer surveys could not be meaningfully appealed, removed, or corrected, even when a customer's written explanation revealed bias, misunderstanding, or hostility toward disability-related speech, pace, tone, affect, tics, pressured speech, or perceived psychiatric presentation.

46. Plaintiff recalls specific GEICO survey comments concerning the disability-linked manner in which he spoke or presented on calls, including at least one customer complaint concerning his 'call opening.' Plaintiff alleges that these comments reflected reactions to disability-linked speech, tone, pace, affect, tics, or psychiatric presentation rather than deficient substantive call resolution. The complete comments, associated ratings, dates, customer responses, and GEICO's internal use of them are stored in GEICO-controlled systems that became unavailable to Plaintiff after separation and will need to be produced in discovery.

46A. On information and belief, GEICO recorded the calls associated with Plaintiff's customer-survey responses and possesses or controls the full recordings, customer ratings and comments, associated metadata, and records of GEICO's treatment of those inputs. Those materials permit objective comparison of the substantive service actually provided, including whether the customer's issue was resolved, with the customer's subjective reaction. Plaintiff will seek those materials in discovery.

46B. GEICO also possesses workforce-wide data concerning survey distributions, customer comments, scoring, rankings, disability and accommodation information, discipline, rolling-termination outcomes, and internal-application eligibility and outcomes. Those employer-controlled data can be analyzed using proper comparison groups and denominators to test the five-factor composite policy's impact on employees with disabilities affecting communication or customer perception. Plaintiff brings only his own claims and does not seek to represent a class pro se, but workforce-wide evidence remains relevant to the disparate-impact and pretext issues pleaded here.

47. Because only 'excellent' counted as passing, discrimination or disability bias could operate in the narrow space between 'very good' and 'excellent.' A customer did not need to rate an employee 'poor' to create an employment penalty; withholding the word 'excellent' had the same practical effect under the threshold.

48. GEICO therefore converted subjective and unreviewed customer reactions into performance scores, termination risk, ranking consequences, and internal-mobility barriers.

49. By giving unreviewed customer reactions decisive employment weight, GEICO adopted the effects of any disability bias embedded in those ratings as part of its own employment criteria.

50. GEICO also used performance metrics and internal mobility prerequisites as barriers to internal posting and advancement. GEICO's internal mobility guidance stated that associates generally needed a performance rating of 3 or higher to be considered for internal opportunities, but that exceptions would be considered on a case-by-case basis.

51. The case-by-case exception language is central because it shows GEICO had discretion to consider exceptions to internal-mobility prerequisites, including an individualized ADA-related exception.

Hickey v. Government Employees Insurance Company d/b/a GEICO

52. Plaintiff alleges GEICO used the 77 percent customer-survey metric as an internal-posting barrier and thereby transformed a call-center production measure into a selection criterion or qualification standard for non-call-center roles.

## C. Protected ADA Activity and the Limited Accommodation Requested

53. In March 2025, Plaintiff disclosed his disability and initiated an ADA accommodation process with GEICO.

54. On or about March 26, 2025, Plaintiff submitted a request for accommodation related to bipolar disorder and explained that the request was not necessarily related to leave.

55. On or about April 11, 2025, Plaintiff's treating psychiatrist provided documentation supporting a specific, limited accommodation.

56. The medical documentation stated that Plaintiff may occasionally exhibit communication difficulties reflected in customer satisfaction surveys, that those fluctuations appeared related to Plaintiff's medical condition, and that the surveys might not accurately reflect Plaintiff's overall capabilities or professional potential.

57. The medical documentation further stated that Plaintiff's cognitive and professional strengths were more likely to be fully realized outside of a call-center setting.

58. Plaintiff's treating provider recommended that the survey-score requirement be waived only when Plaintiff applied for internal positions outside of the call center.

59. The medical documentation expressly made clear that the request did not apply to Plaintiff's current position and that Plaintiff wished to be held to the same standard as others in his current role.

60. Plaintiff did not ask GEICO to lower the survey standard for his current call-center role. He did not ask for a guaranteed promotion, guaranteed transfer, or automatic placement. He asked only that a disability-impacted call-center survey metric not operate as an absolute barrier to applying or posting for non-call-center roles.

61. Plaintiff's requested accommodation was therefore a request for equal access to compete, policy modification, application-process modification, and reassignment-related accommodation, not an exemption from performing his current job.

62. On April 14, 2025, after receiving the treating psychiatrist's April 11 letter, GEICO issued a cure notice declaring the certification 'NOT complete and sufficient' and requiring additional information by April 21. The sole item listed under 'Information Needed' was: 'Need the provider to complete the ADA forms.'

63. The cure notice did not identify a missing diagnosis, functional limitation, duration, medical nexus, or recommended accommodation; identify any contradiction in the psychiatrist's letter; or request targeted clarification about the survey/posting modification. GEICO did not identify a genuine substantive medical deficiency in the provider's explanation.

64. GEICO's required Accommodation Assessment Form stated that its purpose was to enable the associate to perform the essential functions of 'his/her position.' It repeatedly asked which essential functions of the current job could not be performed, what accommodation would enable performance of those functions, and whether leave would assist the employee.

65. That current-position and leave-oriented form did not fit the accommodation actually requested. Plaintiff expressly sought to remain subject to the ordinary standards of his current call-center

Hickey v. Government Employees Insurance Company d/b/a GEICO

position while obtaining disability-neutral access to compete for different non-call-center positions. Requiring only that form did not answer whether GEICO could modify the survey prerequisite in its application and posting process.

**D. Supervisor and Management Conduct After the Accommodation Request**

66. In early to mid-March 2025, Plaintiff asked supervisor Mia Barnes-Black whether GEICO's i-Sight/Leave Team handled non-leave ADA accommodations. Plaintiff explained that his condition directly affected survey scores and that he sought consideration of the possibility of posting to an equal- or higher-grade position away from the call center, where the same customer-facing barrier would be reduced.

67. Mia responded by sending Plaintiff a screenshot of open internal positions. The screenshot included Commercial Underwriting Supervisor, Commercial Product Relations Analyst, Senior Manager - Endpoint Security, Commercial Supervisor, NPMC Data Operations Supervisor, and Financial Analyst - FP&A.

68. Plaintiff was particularly interested in and would have applied for Commercial Product Relations Analyst, Financial Analyst - FP&A, Executive Assistant, and other non-call-center openings for which he met the posted requirements. He also was prepared to submit his resume and seek an individualized review of his qualifications for the other positions Mia identified; Plaintiff does not allege that he was entitled to selection for any particular job.

69. Plaintiff had a Master's degree in Business Management, more than four years of GEICO experience, a promotion to Service Representative IV, substantial company and customer-service knowledge, strong productivity results, and writing and analytical abilities that provided a good-faith basis to compete for those roles.

70. Plaintiff alleges that, after consulting with management, Mia told him not to apply for higher-level positions because the applications would be automatically blocked or denied under the normal survey/performance prerequisites.

71. Plaintiff would have applied for the identified analyst and Executive Assistant positions, and would have sought consideration for other listed non-call-center roles for which he met the minimum requirements, but for GEICO's communicated barrier and Mia's instruction not to submit applications that would be automatically blocked.

72. After management consultation, Mia shifted away from comparable non-call-center opportunities and pressured Plaintiff toward a lower-paid mailroom position or demotion that Plaintiff could not afford and that did not match his qualifications.

72A. This shift and pressure began almost immediately after Plaintiff initiated the accommodation process and before HR decided the request. Thus, while GEICO controlled and was still considering the requested modification of the internal-application barrier, Plaintiff was instructed not to use the application process for positions he otherwise would have pursued and was redirected toward materially lower-paid work.

73. Plaintiff alleges the lower-paid mailroom option was not an effective accommodation and would have been materially adverse, especially where GEICO did not meaningfully evaluate the identified non-call-center vacancies.

Hickey v. Government Employees Insurance Company d/b/a GEICO

74. During a conversation about accommodations, Plaintiff asked how GEICO would accommodate an employee who became deaf. Plaintiff alleges Mia responded that such an employee could be moved to an internet role, but then implied that this path would not apply to Plaintiff because his disability was psychiatric rather than physical.

75. Plaintiff alleges this statement showed that GEICO recognized non-call-center or internet-based accommodation paths but did not make the same individualized path available when Plaintiff's request was tied to bipolar disorder.

76. In mid-to-late March 2025, after Plaintiff initiated the ADA accommodation process and while the request remained pending with HR, incoming supervisor Danny Iwuji held a meeting with Plaintiff while Plaintiff was between supervisors. Danny directed that the entire conversation be kept 'off the record.' Danny's knowledge of the request and of Plaintiff's disclosure caused Plaintiff to understand that information provided to his prior supervisor had been communicated to Danny.

77. During the meeting, Danny heavily pressed Plaintiff about an alleged inability to perform and stated, 'Hey, you've got to assume that this ADA request isn't going to be approved.' Danny framed his statements as an effort to 'look out for [Plaintiff's] best interest,' even though GEICO had not completed the accommodation process.

78. Danny repeatedly insisted that Plaintiff resign, seek work outside GEICO, or post into a lower-paying position. Danny specifically pressed Plaintiff to pursue a mailroom or similar lower-paid clerk position, which Plaintiff could not afford and which did not match his education, experience, or the comparable non-call-center positions he sought.

79. Danny expressly warned Plaintiff that if his scores did not improve by June, Plaintiff would be terminated. Danny also stated, exactly, 'No one put a gun to your head and forced you to work at GEICO.' Plaintiff further recorded Danny asking, in words or substance, what would happen if Danny told his own manager that he was sorry but there was nothing he could do to change the performance of his agents; Danny said that explanation would not be accepted.

80. Plaintiff told Danny that the challenged call behaviors were related to Plaintiff's bipolar disorder and that the ADA request had already gone to HR. Danny pointed to his own black hair and stated, 'For example, I can't change this.' Danny then contrasted his hair with call behaviors Plaintiff had described, including talking too fast, and implied that Plaintiff could simply change manifestations Plaintiff attributed to bipolar disorder.

81. When Plaintiff questioned whether pressuring him into a lower-paid position while an ADA request was pending was permitted, Danny stated, 'HR can do their thing, but since it hasn't been approved yet— it's still pending—I'm just trying to give advice.' Danny then again insisted that Plaintiff pursue the mailroom or a similar lower-paid clerk position. Plaintiff further alleges, in substance rather than as a verbatim quotation, that Danny communicated that he did not care whether the mailroom proposal was legally permissible.

81A. In the same sequence of accommodation-related discussions, Plaintiff alleges that Danny dismissed the disability-related survey explanation as a 'survey excuse,' threatened performance memoranda, and said he could not afford a 'bad performer' on his team because Plaintiff's performance would affect Danny's own numbers.

Hickey v. Government Employees Insurance Company d/b/a GEICO

81B. Plaintiff further alleges that Danny generalized from Plaintiff's call-center survey difficulties and declared him unsuited for any role that interacted with customers at all. Plaintiff alleges that this was a global, disability-based disqualification rather than an individualized assessment of Plaintiff's ability to perform any particular vacant job.

81C. Plaintiff further alleges that Danny stated, 'I can prove it's not the disability,' but identified no data, call example, medical evidence, or objective basis supporting that assertion. Because this meeting preceded the April 11 psychiatrist letter, Plaintiff alleges that Danny prematurely rejected Plaintiff's disclosed disability nexus while the request was pending; after GEICO received the psychiatrist's April 11 documentation, GEICO identified no contrary medical evidence and did not seek targeted clarification of the documented survey nexus.

81D. Shortly thereafter, in fulfillment of the threatened performance escalation, Danny issued or participated in an official memorandum for a call during which Plaintiff experienced a bipolar episode and was described as 'distracted' at the beginning of the call. Plaintiff alleges that Danny issued the memorandum without the ordinary prior coaching, documented conversation, or warning.

81E. The meeting caused an immediate exacerbation of Plaintiff's bipolar symptoms. Plaintiff alleges that he informed prior supervisor Mia Barnes-Black that the meeting's distress required him to take the remainder of the day off. Immediately after leaving the meeting, Plaintiff told his wife, 'I just got retaliated against.'

81F. That night, Plaintiff drafted a pre-resignation letter stating that he had been pressured to resign or accept lower-paid work while the ADA request was pending, that management had treated his condition as something he could simply change, that he was not receiving a fair opportunity for accommodation, and that the conditions had become untenable. Plaintiff did not send that draft at the time because his wife advised him not to resign immediately and Plaintiff continued awaiting GEICO's formal accommodation response.

81G. Plaintiff alleges that the meeting and closely related performance escalation were not ordinary coaching. They communicated that continued pursuit of accommodation would not be honored and that Plaintiff instead should accept inferior work, remain exposed to announced termination, or leave GEICO.

81H. Plaintiff alleges that the statements and pressure were intended, and were objectively reasonably likely, to deter him from continuing to exercise ADA rights, cause him to abandon the pending accommodation and internal-application process, and pressure him toward demotion or resignation. The conduct worsened Plaintiff's bipolar symptoms and contributed to his eventual constructive discharge.

**E. The April 30 HR Meeting, May 1 Memorial Email, and Categorical Denial**
82. On April 30, 2025, Plaintiff met with GEICO Human Resources representative Melissa Miiller regarding his accommodation request.

83. GEICO's own internal HR note for that meeting recorded that Plaintiff felt his disability was hindering him because survey results were impacted, that he wanted an analytical position off the phones, and that he 'does not want to change the surveys just not let them count when he posts.'

84. The same internal note recorded that HR advised Plaintiff that GEICO could not remove an essential function and that GEICO 'cannot remove the survey,' then redirected the discussion toward accommodations that might help Plaintiff achieve better survey results.

Hickey v. Government Employees Insurance Company d/b/a GEICO

85. The April 30 note corroborates the central point: GEICO understood Plaintiff was not asking to change surveys in the current role, but was asking that surveys not count as an absolute barrier when he posted for other roles.

86. On May 1, 2025, the morning after the meeting, Plaintiff sent Melissa a contemporaneous memorial email titled 'Follow-up on ADA Accommodation Discussion.'

87. In the May 1 email, Plaintiff wrote that he had explained his bipolar disorder caused involuntary tics and other major symptoms negatively affecting customer-survey scores, making the 77 percent threshold unattainable without accommodation.

88. Plaintiff wrote that he proposed, 'rather than changing the survey standard,' that GEICO remove the metric as a barrier for Plaintiff to apply or post out to higher-level, non-call-center positions, leveraging his Master's degree in Business Management to perform roles where bipolar-related symptoms would have less impact.

89. Plaintiff contemporaneously documented that Melissa stated, in substance or words to the following effect, that surveys were an essential job function and GEICO could not change or waive that standard for any reason, and that the 77 percent metric could not be waived for posting out of the call center.

90. Plaintiff documented that additional coaching was discussed, but that coaching would not affect Plaintiff's tics or other symptoms and therefore would not enable him to meet the standard. Plaintiff also documented that Melissa encouraged submission of forms but that the categorical-denial statements would still stand.

91. Plaintiff also documented an autism-related remark, stating that when he raised autism as a hypothetical example, Melissa responded in substance: 'Not sure why someone with autism would apply in the first place.'

92. The May 1 email stated that quotations were approximations because Plaintiff did not have a flawless memory and that a response was not necessary. The email was intended as a contemporaneous memorialization, not a request for a courtesy acknowledgment or read receipt.

93. GEICO nevertheless never corrected the substance of Plaintiff's memorialization and never separately informed him before May 12 that the requested survey/posting modification remained under consideration, that the metric could be considered for waiver, or that GEICO would conduct a case-by-case ADA exception analysis.

94. If GEICO believed Plaintiff had materially misunderstood the April 30 meeting, it could have provided that substantive clarification even though no acknowledgment of receipt was requested. GEICO did not do so.

**F. GEICO's Mischaracterization of the Request as Impatience or Special Treatment**

95. GEICO later characterized Plaintiff's allegations as complaints that GEICO did not immediately grant his accommodation of choice, sought additional information, and discussed other potential accommodations.

96. That characterization is materially misleading. Plaintiff did not resign because GEICO took time to evaluate his request. Plaintiff resigned after GEICO communicated that the requested survey/posting modification was categorically unavailable, never substantively corrected the May 1

Hickey v. Government Employees Insurance Company d/b/a GEICO

memorialization or separately stated that the requested modification remained open, and left Plaintiff subject to an unaccommodated metric that made termination imminent.

97. 'We need time to evaluate' and 'we cannot waive this metric' are materially different positions. The first describes an ongoing interactive process. The second describes a predetermined refusal.

98. GEICO cannot recast a categorical refusal as ordinary deliberation merely by calling Plaintiff impatient or describing the requested accommodation as Plaintiff's preferred choice.

99. GEICO's claim that Plaintiff sought 'special treatment' is also misleading. Plaintiff did not seek preferential selection. Plaintiff sought equal access to compete.

100. A disability-related modification to a posting barrier is not unlawful favoritism. It is the kind of individualized accommodation analysis the ADA requires when an employment rule or selection criterion creates a disability-related barrier.

101. GEICO's own later recitation of the provider letter confirms that the requested waiver applied only to internal applications outside the call center and did not apply to Plaintiff's current position. GEICO therefore knew Plaintiff was not asking to lower current-job production standards.

102. GEICO nevertheless evaluated the request as though Plaintiff asked to lower current-job standards or be excused from current job duties. That was a strawman. The relevant question was whether GEICO could reasonably modify a disability-impacted survey metric as an internal-posting barrier to allow Plaintiff equal access to compete for non-call-center roles.

103. GEICO never meaningfully answered that question before Plaintiff's resignation.

## G. Coaching Was Not an Effective Accommodation

104. GEICO relied on coaching as an asserted accommodation. GEICO later argued that coaching had previously helped Plaintiff satisfy his survey metric and that Plaintiff rejected coaching.

105. Coaching does not defeat Plaintiff's failure-to-accommodate claim because coaching did not address the workplace barrier Plaintiff identified.

106. Plaintiff did not request coaching to improve ordinary call-center technique. Plaintiff requested that GEICO modify or waive a disability-impacted customer-survey metric as an absolute barrier to applying or posting for non-call-center positions where that metric was not job-related.

107. Coaching had helped Plaintiff previously when he was still learning the position and before the relevant bipolar exacerbation. By April and May 2025, however, Plaintiff's barrier was not lack of skill.

108. Plaintiff's active bipolar symptoms included involuntary tics, pressured speech, distractibility, insomnia, and communication-related symptoms that affected customer perception and survey scores. Coaching cannot cure involuntary psychiatric symptoms.

109. Coaching could not erase already-accrued survey history, could not waive the survey metric as an internal-posting barrier, could not change GEICO's internal mobility eligibility rules, and could not cure disability-related symptoms affecting customer perception.

110. GEICO's coaching defense is internally unstable. If coaching was effective, then Plaintiff was qualified with accommodation for the current role and GEICO's 'not qualified' defense is weakened. If coaching was ineffective, then coaching was not a reasonable accommodation and GEICO was

Hickey v. Government Employees Insurance Company d/b/a GEICO

required to consider other effective accommodations, including modification of the survey/posting rule, a case-by-case exception, or reassignment-related accommodation.

111. GEICO cannot use coaching simultaneously as proof that Plaintiff was accommodated and as proof that Plaintiff was not qualified.

112. GEICO's alleged willingness to discuss coaching therefore did not make the interactive process meaningful. It left the actual barrier intact. A process that offers only accommodations aimed at improving survey scores, while categorically refusing to consider whether the survey metric can be modified as a posting barrier, is not a good-faith ADA process.

**H. GEICO's Post Hoc Current-Job/Form Rationale Applied the Wrong ADA Framework**

113. GEICO later asserted that Plaintiff's treating provider proposed only a single modification, that the modification would not have helped Plaintiff perform the essential functions of his current call-center job, and that the requested accommodation therefore did not appear to be reasonable.

114. That assertion misstates the accommodation requested and evaluates the request against the wrong position.

115. Plaintiff did not ask GEICO to lower the survey standard in his current call-center role, excuse him from taking customer calls in his current role, eliminate an essential function of the Service Representative position while keeping him in that position, or guarantee him a promotion or transfer.

116. GEICO knew the scope of the request because Plaintiff's medical documentation tied the request to internal positions outside the call center and stated that the request did not apply to Plaintiff's current position.

117. GEICO's later assertion that the accommodation would not help Plaintiff perform the essential functions of his current job therefore does not answer the actual ADA question.

117A. GEICO's forms rationale suffers from the same mismatch. GEICO later supplied a rationale that its April 14 cure notice did not state: because the treating psychiatrist's proposed application-process modification would not improve Plaintiff's performance in his current job, the request did not appear reasonable and additional forms were necessary. That contention assumes that every ADA accommodation must enable performance of the employee's existing position. Title I imposes no such limitation.

117B. Title I separately protects job application procedures, hiring, advancement, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). It defines a qualified individual by reference to the employment position the individual 'holds or desires.' 42 U.S.C. § 12111(8). The regulations separately recognize modifications to a job application process that enable a qualified applicant with a disability to be considered for a desired position, modifications enabling performance of a position held or desired, and modifications providing equal access to employment benefits and privileges. 29 C.F.R. § 1630.2(o)(1)(i)-(iii).

117C. Applying Title I standards, the Fourth Circuit likewise evaluates qualification and accommodation with reference to the position sought, not only the employee's current position. Reyazuddin v. Montgomery Cnty., Md., 789 F.3d 407, 414-19 (4th Cir. 2015).

117D. The fact that the requested modification would not improve Plaintiff's current-job performance was therefore not a medical deficiency; it was the expressly stated boundary of the request. The psychiatrist limited the recommendation to Plaintiff's access to internal positions outside the call

Hickey v. Government Employees Insurance Company d/b/a GEICO

center because Plaintiff wished to remain subject to the ordinary standards of his current role. Treating that limitation as proof that the accommodation was unreasonable would make GEICO's analysis self-sealing: an application- or advancement-related accommodation could never satisfy a form written exclusively around performance of the current job.

117E. GEICO's stated reason for seeking more information also did not match the sole instruction in its cure notice. If GEICO genuinely needed information to evaluate the requested application-process modification or possible alternatives, it could have identified the missing information and asked targeted questions concerning the positions desired, Plaintiff's qualifications, the relationship between the survey prerequisite and those positions, the disability-related barrier, alternative effective modifications, or undue hardship. Instead, the cure notice stated only, 'Need the provider to complete the ADA forms,' even though GEICO's prescribed form repeatedly asked about current-position functions and leave.

117F. Plaintiff does not allege that GEICO was categorically prohibited from seeking reasonable medical documentation or targeted clarification. Plaintiff alleges that GEICO already possessed a treating psychiatrist's letter identifying the impairment, the disability-related effect on the survey metric, the medical nexus, the requested modification, and the precise scope of the request, yet GEICO identified no substantive medical deficiency and demanded only a mismatched current-position form. Requiring reasonable clarification can be legitimate; using an inapposite form while leaving the actual application and advancement question unanswered does not establish a good-faith individualized assessment.

117G. Plaintiff sought equal access to apply and compete, not a guaranteed promotion or automatic reassignment. GEICO remained free to compare Plaintiff's qualifications with the lawful requirements and essential functions of each desired position. What GEICO could not lawfully do, as alleged, was treat the requested application-process accommodation as unreasonable merely because it would not change Plaintiff's current job, while preserving a disability-affected and allegedly unrelated survey metric as an automatic gateway barrier without individualized review.

118. The relevant question was not whether the accommodation would improve Plaintiff's current call-center survey performance. The relevant question was whether GEICO could reasonably modify or waive a disability-impacted survey metric as an internal-posting barrier so Plaintiff could have equal access to compete for positions where that metric was not job-related.

119. GEICO rejected the request as unreasonable by measuring it against the wrong job and the wrong barrier.

120. A targeted medical recommendation is not a defect. It clarifies the disability-related barrier and the accommodation requested. If GEICO believed the request was not workable, a good-faith assessment would have considered which positions Plaintiff wished to pursue, what qualifications those positions required, whether Plaintiff met those qualifications, whether the survey metric was job-related to those roles, whether a case-by-case exception was available, and whether allowing Plaintiff to compete would impose undue hardship.

121. GEICO did not conduct that analysis before communicating that the survey metric could not be waived or removed.

122. GEICO's claim that the accommodation 'did not appear to be reasonable' is also inconsistent with GEICO's claim that it was still collecting information and still evaluating Plaintiff's request. If GEICO was still trying to understand whether the request was reasonable, then declaring it

Hickey v. Government Employees Insurance Company d/b/a GEICO

unreasonable was premature. If GEICO had already determined it was unreasonable, then GEICO's claim that the process remained meaningfully open was pretextual or materially misleading.

## I. Blanket Denial and Failure to Conduct Individualized Assessment

123. The ADA does not permit a covered employer to respond to a known disability-related employment barrier with a blanket, predetermined refusal to consider any exception, modification, or individualized assessment.

124. An employer may ultimately deny a requested accommodation if it is not reasonable, if no effective accommodation exists, if the employee is not qualified for the position held or desired, if reassignment is not available, or if the accommodation would impose undue hardship. But the employer must reach that conclusion through a good-faith, individualized analysis of the actual request and actual barrier, not through a blanket rule that the accommodation can never be considered.

125. A blanket denial is especially unlawful where the accommodation requested is itself a policy modification or application-process modification, because the ADA expressly recognizes modifications to policies, criteria, and application procedures as potential reasonable accommodations.

126. GEICO did not ask Plaintiff for his resume as part of a meaningful reassignment or internal-mobility analysis.

127. GEICO did not compare Plaintiff's Master's degree, education, experience, writing ability, analytical abilities, productivity history, Workday profile, or professional qualifications to specific vacant non-call-center roles.

128. GEICO did not identify which non-call-center vacancies existed and whether Plaintiff was qualified for them.

129. GEICO did not determine whether the customer-survey metric was job-related to those non-call-center roles.

130. GEICO did not determine whether using a call-center customer-survey metric as a posting barrier was consistent with business necessity for the positions Plaintiff sought.

131. GEICO did not issue a written undue-hardship determination.

132. GEICO did not identify any individualized reason that allowing Plaintiff to compete without the disability-impacted survey barrier would impose undue hardship.

133. GEICO did not provide a claimant-facing clarification before Plaintiff resigned stating that GEICO would consider the requested survey/posting modification on a case-by-case basis, notwithstanding that the May 1 email did not request a courtesy response.

134. Instead, GEICO preserved the survey metric, redirected Plaintiff toward coaching, and later blamed Plaintiff for not applying through the same internal process that GEICO had left blocked.

135. GEICO's blanket denial supports multiple ADA theories: failure to accommodate, failure to engage in a good-faith interactive process, disability discrimination in internal application procedures and advancement opportunities, unlawful use of a selection criterion that screened out Plaintiff because of disability, and disparate treatment in the application of case-by-case exceptions.

Hickey v. Government Employees Insurance Company d/b/a GEICO

## J. GEICO's Ordinary-Rule Emails Did Not Show an ADA Exception Review

136. GEICO later claimed it was still collecting information concerning Plaintiff's request, including whether survey results would hinder Plaintiff's ability to obtain a promotion.

137. The internal email thread GEICO relied on does not show a request to waive, modify, disregard, or make a case-by-case ADA exception to the survey/posting rule.

138. On May 1, 2025, at 1:24 p.m., GEICO's Leave Specialist internally asked whether Plaintiff could post for a position higher than his current position. On May 9 at 2:24 p.m., she followed up: 'Please respond today.' Plaintiff sent his resignation at 11:17 a.m. on May 12. Only at 2:18 p.m. that day, approximately three hours after the resignation, did an internal recipient answer that Plaintiff was not believed to be restricted or forbidden from posting 'beyond the normal prerequisites'; the response acknowledged Plaintiff's resignation and apologized for the delay.

139. The post-resignation internal answer did not provide Plaintiff actionable access to the application process while he remained employed and did not evaluate whether the normal survey/performance prerequisite could be modified as an ADA accommodation. Asking what the ordinary eligibility rules allowed was not the same as evaluating an exception to those rules.

140. The phrase 'beyond the normal prerequisites' preserved the very barrier Plaintiff was asking GEICO to modify.

141. GEICO therefore conflated ordinary internal-posting eligibility review with a meaningful ADA accommodation review.

142. GEICO's April 25 internal note likewise showed GEICO was already aware that survey scores and internal posting were an issue, but did not show that GEICO was open to an ADA exception. It reflected only that a supervisor denied a special formal prohibition against posting, not that Plaintiff was practically eligible to post higher despite the normal survey/performance prerequisites or that GEICO would consider an ADA modification.

## K. The Failure-to-Apply Defense Is Circular and Futility-Based

143. GEICO argued Plaintiff was not denied a position because he did not apply for other roles before resigning.

144. That argument is circular because Plaintiff's accommodation request concerned access to the internal application process itself.

145. As alleged above, Mia sent Plaintiff a screenshot of actual openings that included analyst and other non-call-center positions, and Plaintiff also identified Executive Assistant openings.

146. Plaintiff would have applied for Commercial Product Relations Analyst, Financial Analyst - FP&A, Executive Assistant, and other non-call-center openings for which he met the posted requirements, and he would have sought individualized review of his qualifications for the additional roles Mia identified.

147. Plaintiff alleges Mia later told him not to submit higher-level applications because they would be automatically blocked or denied under the survey/performance prerequisites.

148. GEICO cannot maintain the disability-impacted barrier, refuse to consider a disability-related exception, and then fault Plaintiff for not applying through the blocked process.

149. To the extent a formal application was required, Plaintiff alleges application would have been futile after HR stated that the 77 percent metric could not be waived for posting out and Mia advised that higher-level applications would be automatically blocked or denied.

150. Plaintiff was not asking GEICO to select him over more qualified applicants. Plaintiff was asking GEICO to permit him to compete without a disability-impacted call-center metric operating as an automatic screen.

**L. Two Independent Disparate-Impact Applications: Current-Role Outsourced Customer Bias and Cross-Job Screen-Out**

151. Plaintiff alleges GEICO's survey system created a disability-sensitive employment screen. Because only 'excellent' counted as passing, a customer did not need to use an explicit slur or give a 'poor' rating; discomfort with disability-related speech, tone, pace, tics, affect, or psychiatric presentation could reduce a technically successful call from 'excellent' to 'very good' and create the same practical penalty.

152. For the current-role outsourced-customer-bias theory, the challenged policy arose from the combined and inseparable operation of five features: (1) subjective customer surveys; (2) an 'excellent-only' rule and approximately 77 percent threshold; (3) customer-survey results constituting approximately one-half of an employee's overall performance rating; (4) no meaningful appeal, neutral review, or bias-screening process; and (5) GEICO's rolling terminations, approximately every six months, of the bottom 10 percent to 25 percent of the call-center floor. The third feature gave any bias embedded in customer-survey inputs extraordinary weight in overall performance; the fifth supplied the recurring job-loss mechanism that made the composite rating a condition of continued employment.

152A. Plaintiff challenges these five features only in their combined and inseparable operation for the current-role disparate-impact theory. Plaintiff does not ask the Court to decide, and takes no position in this Complaint on, whether any single feature, any subset of the features, or any hypothetical system with even one feature removed would itself create an unlawful disparate impact. Plaintiff alleges that GEICO's actual system, with all five features operating together, caused the current-role disparate impact alleged. This limitation does not alter Plaintiff's separately pleaded cross-job application-screen theory.

153. GEICO gave those unreviewed customer-survey results approximately one-half of the overall performance rating and then used the resulting rating in ranking, discipline, termination risk, and internal mobility. The survey component therefore was not incidental feedback; it was one of the two dominant inputs into the employment rating that carried the challenged consequences.

154. Plaintiff's bipolar disorder caused symptoms that could affect customer perception, including involuntary tics, pressured speech, distractibility, and related communication symptoms when active.

155. As applied to Plaintiff, GEICO's policy converted disability-impacted customer perception into a performance and internal-mobility barrier. The same policy tended to disadvantage employees with disabilities affecting speech, pace, tone, affect, tics, psychiatric presentation, neurological functioning, or customer perception.

156. Plaintiff brings this policy-based claim only on his own behalf and does not seek to represent absent employees pro se.

157. The five-factor composite survey regime produced a first, independent discriminatory effect within Plaintiff's current call-center role. GEICO gave unreviewed customer reactions—including reactions to

Hickey v. Government Employees Insurance Company d/b/a GEICO

disability-linked speech, tone, pace, affect, tics, and psychiatric presentation—approximately one-half of the power in the overall performance rating and then linked that rating to ranking, discipline, and rolling termination. The wrong alleged is not the collection of customer feedback or the enforcement of a legitimate service standard. It is GEICO's conversion of unreviewed, disability-sensitive customer reactions into its own heavily weighted employment criterion, thereby giving customer bias the force of an employer decision. Customer service may be a legitimate subject of measurement; a customer's adverse reaction to disability, as distinct from deficient service, is not legitimate performance.

157A. Second and independently, GEICO exported the resulting survey metric from its current-role performance system and used it as an absolute prerequisite for access to the internal application process for materially different positions. GEICO allegedly did so after receiving Plaintiff's treating psychiatrist's individualized medical explanation connecting the survey results to disability-related communication manifestations, and without establishing that the metric was job-related and consistent with business necessity for the positions Plaintiff sought. This cross-job screen-out was a separate use, a separate injury, and a separate statutory violation; it does not depend on proving that every use of the metric within Plaintiff's existing call-center position was unlawful.

158. GEICO's anticipated defense that disabled employees generally may be held to the same legitimate performance standards does not answer either theory. As to the current role, Plaintiff does not demand that GEICO lower a lawful standard, excuse genuine service failures, or inflate his score; he alleges that the five-factor composite measurement system itself converted unreviewed disability-biased customer reactions into heavily weighted employment consequences. A rule that an employer need not lower a legitimate performance standard does not transform discriminatory customer input into legitimate performance. As to materially different positions, any relevance the survey metric may have had to call-center work did not establish that it was job-related for those jobs.

158A. The two theories are pleaded independently and in the alternative. The current-role outsourced-customer-bias theory does not depend on Plaintiff's completion of an application or entitlement to a promotion. The cross-job application-screen theory does not depend on invalidating every use of customer feedback in the current role. Plaintiff challenges the allegedly biased measure of actual performance in his existing job and seeks equal access to apply and compete for other jobs—not immunity from legitimate standards in either setting.

## M. Constructive Discharge and Resignation

159. Plaintiff's medical condition worsened after GEICO's response to his accommodation request, supervisor pressure, alleged disability-based comments, the categorical denial, GEICO's failure to clarify that the requested modification remained open after the May 1 memorialization, and GEICO's failure to provide an effective accommodation. By May 12, this was not ordinary workplace distress: Plaintiff's mental health had completely deteriorated. He was experiencing severe insomnia, manic and depressive symptoms, suicidal thoughts, and worsening symptoms he recognized from his bipolar history as pre-psychotic, and he reasonably feared that continued exposure would lead to psychosis, hospitalization, or destruction of his family relationships.

160. Plaintiff alleges that, by May 12, he had exhausted the FMLA leave available to him. GEICO's final pay statement independently recorded zero available sick, vacation, and floating-holiday balances, and GEICO had completely eliminated separate personal time. Those facts eliminated every temporary means by which Plaintiff had been escaping or recovering from the worsening symptoms

Hickey v. Government Employees Insurance Company d/b/a GEICO

while GEICO refused to provide or meaningfully assess an effective accommodation. Plaintiff also believed termination under the unaccommodated metric was imminent or mathematically certain.

160A. GEICO also required employees to charge unscheduled bathroom breaks against sick or vacation time or else incur an attendance occurrence and potential memorandum or discipline. Plaintiff had already been forced to defecate in his clothing on at least one occasion rather than incur discipline. With available FMLA leave exhausted, sick and vacation balances at zero, and personal time eliminated, every additional call-center shift presented the same forced choice between remaining on the phones through an urgent bodily need and risking discipline for leaving the phones.

160B. By May 12, the combined effects of severe insomnia, manic and depressive symptoms, suicidal thoughts, pre-psychotic symptoms, exhausted leave, uninterrupted call-center demands, hostility, GEICO's alleged ADA violations, and the policies and conduct Plaintiff regarded as unethical rendered Plaintiff physically and psychiatrically unable to sustain another shift under GEICO's then-existing, unaccommodated call-center conditions without risking further decompensation, hospitalization, and renewed bodily humiliation. This was an acute, time-specific, and condition-specific inability to continue safely in that environment—not a permanent inability to work, a general inability to interact with customers, or an inability to perform the non-call-center positions for which Plaintiff sought equal access to compete.

161. On May 12, 2025, Plaintiff resigned effective immediately. His resignation letter opened by stating that GEICO had destroyed his mental health and that he had to resign 'due to being provided no meaningful accommodation or interactive process.' The letter expressly stated: 'I consider my resignation a constructive discharge.'

162. The policy criticisms in Plaintiff's resignation letter were not unrelated grievances. After stating that GEICO had destroyed his mental health and provided no meaningful accommodation or interactive process, Plaintiff wrote that 'the below issues among others have exacerbated the problem.' He then criticized GEICO's metrics and rolling terminations, benefit reductions, office-presence requirements, eliminated personal time, bathroom-break rule, removed off-phone mental-health discussion time, and other conduct he regarded as unethical. Those were the policies and conditions Plaintiff alleges exacerbated his bipolar disorder, intensified the hostility and physical consequences, depleted his remaining means of temporary relief, and made continued employment intolerable. His gratitude toward individual supervisors did not negate that causal account or his express constructive-discharge statement.

163. When Plaintiff resigned, Danny allegedly stated, 'I was expecting this,' which Plaintiff alleges supports the inference that management understood the accommodation denial and pressure had made continued employment untenable.

164. After leaving GEICO, Plaintiff obtained comparable customer-facing work with Liberty Mutual. A Liberty Mutual performance dashboard covering January 1 through July 14, 2026 shows that Plaintiff handled 1,479 calls, received 68 customer behavioral surveys, achieved a 100.0 percent behavioral score, and reached 118.4 percent of the behavioral goal.

165. Based on Plaintiff's survey records and personal knowledge, 66 of the 68 Liberty Mutual surveys were top-box results and the remaining two were favorable; none was adverse. Liberty's survey separately asked whether the agent made matters easy, was friendly and courteous, was knowledgeable, and completely resolved the issue, and its system included a review or adjustment mechanism. Although the evidence concerns a later period and a different employer, it corroborates

Complaint - Page 20

Hickey v. Government Employees Insurance Company d/b/a GEICO

Plaintiff's ability to perform customer-facing work and contradicts a blanket characterization that he was unable to interact effectively with customers.

166. Plaintiff also alleges that, once Plaintiff's departure was assured, Danny's demeanor became cordial, Danny agreed to serve as a job reference, and Danny agreed that it made no sense to prevent an employee with a Master's degree from competing for other positions based on a call-center metric affected by bipolar disorder and unrelated to the jobs sought. These later statements and conduct further undermine Danny's earlier global characterization that Plaintiff was unsuited to interact with customers or was merely a 'bad performer.'

## N. Protected Opposition in the May 12 Resignation Letter and Materially False or Misleading VEC Reporting

167. Plaintiff engaged in protected activity under the ADA by requesting accommodation, submitting medical documentation, participating in the ADA process, memorializing the April 30 denial in writing on May 1, and opposing disability discrimination in his May 12 resignation letter.

167A. Plaintiff's May 12 resignation letter was itself protected opposition under the ADA. Its opening accused GEICO of providing no meaningful accommodation or interactive process, stated that GEICO had made meaningful accommodation impossible, described the resulting disability-related mental-health injury, and expressly characterized the separation as a constructive discharge. The letter therefore communicated Plaintiff's reasonable belief that GEICO had violated his ADA rights.

167B. GEICO had actual knowledge that the protected resignation letter existed before the challenged SIDES reporting. GEICO or its authorized administrator stated in the SIDES response that Plaintiff gave same-day notice to management and answered 'Yes' when asked whether Plaintiff had provided a written resignation. The form instructed that, if the answer was yes, a copy should be provided, yet the response identified no supporting attachment.

168. On May 23, 2025 at 1:28:42 p.m. and again on May 29, 2025 at 10:17:08 a.m., GEICO and/or its authorized unemployment-benefits administrator transmitted two SIDES responses to the Virginia Employment Commission under the same Request ID, 4001787, but with different confirmation numbers, 161516171 and 161774973.

169. The May 29 transmission amended the answer concerning wages earned after the claim's effective date from $0 to $361 and supplied 13 hours where the earlier response left hours blank. Yet Question 83, which asked why the response was being amended and what changed, remained blank. The later transmission left the disputed separation narrative and material contradictions uncorrected and again included no supporting attachment.

170. Both responses identified the provider as a third-party administrator, TALX UCM Services, Inc.; identified Lora Perry as the preparer; and used an Equifax email address. Plaintiff alleges that GEICO supplied, authorized, adopted, ratified, or caused its authorized administrator to submit the challenged information. The precise GEICO-TALX-Equifax information chain and allocation of responsibility are principally within those entities' possession, custody, or control and will be sought in discovery.

170A. The challenged answers concerned employer-specific facts: what reason Plaintiff gave for leaving, what actions he took to preserve employment, whether management received notice, and whether he provided a written resignation. Plaintiff alleges that TALX entered those answers as GEICO's authorized unemployment-benefits administrator using information supplied, approved, adopted, or ratified by GEICO. GEICO's use of an administrator did not sever the causal connection between GEICO's knowledge of the protected resignation letter and the resulting state-agency

Hickey v. Government Employees Insurance Company d/b/a GEICO

submission. The precise communications among GEICO, TALX, Equifax, and the identified GEICO personnel are within those entities' control and will be sought in discovery.

171. Plaintiff does not allege that GEICO violated the ADA merely by participating in the VEC process, taking a good-faith position on benefits, or accurately reporting an ordinary voluntary resignation. Plaintiff alleges that GEICO retaliated specifically in response to the protected opposition contained in his May 12 resignation letter by causing or authorizing a state-agency submission that contradicted, concealed, and replaced the protected explanation stated in that letter.

172. The method of the alleged retaliation mirrored the protected act. The resignation letter charged that GEICO had provided no meaningful accommodation or interactive process and expressly alleged constructive discharge. Eleven days later, the SIDES response attributed ordinary job dissatisfaction to Plaintiff, omitted the accommodation and constructive-discharge explanation, acknowledged that a written resignation existed, and failed to provide it.

173. GEICO characterized the employee's stated reason for separation as a voluntary quit / job dissatisfaction separation, even though Plaintiff's written resignation letter expressly cited lack of accommodation, lack of interactive process, mental-health harm, and constructive discharge. This effectively put words in Plaintiff's mouth.

174. GEICO acknowledged, on information and belief, that a written resignation letter existed, but did not provide the full letter with the VEC submission and did not accurately report the ADA-protected context of Plaintiff's separation.

175. Plaintiff alleges GEICO's VEC submission was materially false or misleading because it replaced Plaintiff's stated disability-related constructive-discharge explanation with a sanitized job-dissatisfaction narrative.

176. Plaintiff alleges this was materially adverse because a reasonable worker would be dissuaded from asserting ADA rights if an employer could respond by concealing the accommodation request, medical documentation, HR denial, and constructive-discharge letter from a state administrative record.

177. Plaintiff alleges the VEC submission also demonstrates pretext and consciousness that GEICO's separation narrative was inconsistent with Plaintiff's protected ADA activity and resignation letter.

177A. Causation is supported by more than temporal proximity. The SIDES response directly addressed the same subject as the protected letter - Plaintiff's stated reason for resigning - yet substituted a materially different explanation, acknowledged management's receipt of a written resignation while omitting the document, and repeated the challenged narrative in the May 29 amended transmission without explaining the amendment or correcting the separation account. Plaintiff alleges that this close timing, actual knowledge, exact subject-matter correspondence, selective omission, and repetition support a reasonable inference that the SIDES conduct was a response to the protected opposition in the resignation letter.

177B. Plaintiff distinguishes ordinary SIDES participation from the retaliatory manner of participation alleged here. A separation report could have followed the resignation regardless of protected activity; the alleged materially adverse act was the withholding and contradictory replacement of the letter's protected ADA explanation. Plaintiff alleges that the protected opposition in the May 12 letter was a but-for cause of that false or misleading manner of reporting. Plaintiff does not allege that the May 23 or May 29 transmissions retaliated for the EEOC charge filed later.

Hickey v. Government Employees Insurance Company d/b/a GEICO

## O. Specific False or Materially Misleading VEC Statements and Omissions

178. False stated reason for resignation. GEICO reported or caused the VEC record to reflect that Plaintiff resigned due to job dissatisfaction, dissatisfaction with company policy, or an ordinary voluntary quit. That characterization was materially false or misleading because GEICO possessed or knew of Plaintiff's May 12, 2025 written resignation, which expressly stated that Plaintiff resigned due to no meaningful accommodation or interactive process and that Plaintiff considered the resignation a constructive discharge.

179. False or misleading statement that Plaintiff took no actions to preserve employment. GEICO stated or caused the VEC record to state that Plaintiff did not take actions to avoid quitting or explore reasonable solutions before resigning. That was materially false or misleading because Plaintiff had requested accommodation, submitted a psychiatrist letter, participated in an HR meeting, memorialized the denial in writing, and attempted to preserve employment by seeking a non-call-center path where his disability symptoms would have less impact. On information and belief, the VEC form also contained an internal contradiction: GEICO checked 'Yes' that Plaintiff took actions to avoid quitting, while manually stating that no such actions were taken.

180. False last day of work. GEICO submitted or caused false information regarding Plaintiff's last day of work, identifying May 7, 2025 instead of May 12, 2025. Plaintiff worked and resigned on May 12, 2025. Misstating the final work date distorted the chronology of the ADA request, the May 1 memorialization, the period before Plaintiff's May 12 resignation, and the resignation that followed.

181. False job-jeopardy statement. GEICO answered or caused the VEC record to answer that Plaintiff's job was not in jeopardy. That was false or materially misleading because GEICO management had communicated that Plaintiff's survey metrics created impending job jeopardy and that termination in the June 2025 performance process was, in substance, a mathematical certainty due to the rolling bottom 10 percent to 25 percent performance-review structure.

182. False 'No Change' answer concerning the hiring agreement. SIDES Question 73 asked: 'Were there changes in the claimant's hiring agreement that contributed to the claimant leaving this job?' GEICO or its agent answered 'No Change.' Plaintiff alleges that profit sharing was part of his hiring agreement and compensation arrangement when he joined GEICO, that GEICO eliminated profit sharing, and that his resignation letter specifically identified that removal among the changes contributing to his departure.

183. The SIDES narrative also separately answered 'No' when asked whether company policies had changed and whether any change directly affected Plaintiff. Plaintiff alleges that answer omitted material changes described in his resignation letter, including the removal of profit sharing and other benefits, changes in office-presence expectations, a bathroom-break policy, removal of time off the phones for mental-health discussions, and other gradual and severe policy changes. Plaintiff does not allege that each change independently violated the ADA; he alleges that the categorical 'No' and 'No Change' answers materially sanitized the reasons GEICO knew he had stated for leaving.

184. Concealment of the written resignation letter after acknowledging its existence. GEICO acknowledged or caused the VEC record to acknowledge that Plaintiff had provided a written resignation, but failed to attach or provide the resignation letter and represented that there were no supporting attachments. The omission was material because the resignation letter was the primary document explaining Plaintiff's stated reason for separation and directly contradicted GEICO's ordinary voluntary-quit/job-dissatisfaction narrative.

Hickey v. Government Employees Insurance Company d/b/a GEICO

185. Omission of ADA accommodation and medical-documentation context. GEICO omitted or minimized Plaintiff's ADA accommodation request, medical documentation, April 30 HR meeting, May 1 memorial email, and disability-related constructive-discharge explanation. This omission materially changed the nature of the VEC record from an ADA accommodation/constructive-discharge separation into an ordinary voluntary quit.

186. Misleading ratification through later position-statement defense. GEICO later defended its VEC submission by asserting that it merely communicated a legitimate belief that Plaintiff voluntarily resigned. That position did not correct the false or misleading VEC record. Instead, it ratified the voluntary-quit narrative despite GEICO's knowledge that Plaintiff's written resignation stated no meaningful accommodation, no meaningful interactive process, and constructive discharge.

186A. GEICO's Position Statement expressly declared: 'Simply because Mr. Hickey views his resignation as constructive discharge does not make it so, nor is GEICO required to argue Mr. Hickey's case to the VEC on his behalf.' Plaintiff does not allege that GEICO was required to accept his legal conclusion, concede eligibility for benefits, or advocate on his behalf. But SIDES expressly asked what reason Plaintiff gave for leaving and, after GEICO acknowledged that Plaintiff had submitted a written resignation, instructed GEICO to provide a copy. Accurately transmitting Plaintiff's stated reason was therefore not 'arguing' his case; it was reporting a material historical fact the agency expressly requested. Plaintiff alleges that GEICO's own formulation amounts to a confession that, when the truth favored Plaintiff, GEICO had no interest in giving the VEC a complete and truthful account and instead treated truthful disclosure as partisan advocacy, allowing its own adversarial self-interest to determine what the VEC would be told. In context, the statement supports a reasonable inference that the omission and replacement of Plaintiff's ADA-protected explanation were intentional, and it ratifies the challenged reporting as GEICO's chosen position rather than an inadvertent mistake by its administrator.

187. If GEICO actually read Plaintiff's resignation letter before submitting the VEC response, GEICO knowingly misrepresented Plaintiff's stated reason for separation. If GEICO did not read the resignation letter before submitting the VEC response, GEICO acted with reckless disregard by asserting a reason for separation while acknowledging that a written resignation existed and failing to provide the primary document requested by the VEC form.

# VI. COUNTS

## COUNT I - ADA FAILURE TO ACCOMMODATE, FAILURE TO MODIFY POLICY, AND DENIAL OF EQUAL ACCESS TO COMPETE

188. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

189. Plaintiff is a qualified individual with a disability within the meaning of the ADA. Plaintiff was qualified for his current role with reasonable accommodation or, alternatively, was qualified for non-call-center positions he desired and for which he sought equal access to compete.

190. GEICO had notice of Plaintiff's disability and disability-related limitations through Plaintiff's disclosure, prior mental-health leave/FMLA processes, Plaintiff's accommodation request, medical documentation, and communications with supervisors and HR.

191. Plaintiff requested a reasonable accommodation: modification of the survey/posting barrier so that disability-impacted customer-survey scores would not operate as an absolute bar to applying or

Hickey v. Government Employees Insurance Company d/b/a GEICO

posting for non-call-center positions where the metric was not job-related. This was also a request for policy modification, application-process modification, and reassignment-related accommodation.

192. GEICO refused to make that accommodation and did not conduct a good-faith individualized assessment. GEICO instead treated the survey metric as categorically non-waivable, redirected Plaintiff to ineffective coaching, and failed to evaluate Plaintiff's qualifications, target roles, specific vacancies, case-by-case exceptions, job-relatedness, or undue hardship.

193. GEICO's statement that it wanted to keep the interaction going did not make the process meaningful because the only process left open concerned forms, coaching, or improvement of survey scores, not the actual requested survey/posting modification.

193A. GEICO's demand for a current-job and leave-oriented form did not constitute an individualized assessment of the application-process accommodation Plaintiff actually requested. Using the mismatch between that form and the treating psychiatrist's targeted recommendation to label the request unreasonable further supports Plaintiff's allegation that GEICO failed to assess the actual barrier and accommodation in good faith.

194. GEICO violated 42 U.S.C. § 12112(a), § 12112(b)(5)(A), and § 12112(b)(5)(B). GEICO's conduct also violated the good-faith interactive-process principles recognized in Jacobs, Wilson, Summers v. Altarum Institute, Corp., 740 F.3d 325, 331 n.4 (4th Cir. 2014), and Tarquinio.

195. As a direct and proximate result, Plaintiff suffered lost wages, lost employment opportunities, emotional distress, worsening disability symptoms, constructive discharge, reputational harm, and other damages.

## COUNT II - ADA UNLAWFUL QUALIFICATION STANDARD, SELECTION CRITERION, AND DISABILITY SCREEN-OUT

196. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

197. Separately from GEICO's use of customer surveys to evaluate Plaintiff's existing call-center work, GEICO used the resulting 77 percent customer-survey metric and related performance prerequisites as a qualification standard or selection criterion governing access to internal applications and advancement opportunities for materially different positions.

198. The survey metric screened out or tended to screen out Plaintiff, an individual with a disability, because Plaintiff's bipolar symptoms affected customer-survey scores and customer perception.

199. The policy also tended to disadvantage employees with disabilities affecting speech, tone, communication style, psychiatric symptoms, neurological function, or customer perception; Plaintiff alleges this policy effect to support his own claim and does not seek relief for absent persons pro se.

200. GEICO did not demonstrate that the customer-survey metric was job-related for the non-call-center positions Plaintiff sought to compete for or consistent with business necessity for those positions.

201. GEICO did not show that Plaintiff could not be accommodated through a modification of the posting criterion, a case-by-case exception, or access to compete without guaranteed selection. This screen-out theory does not depend on whether the survey metric could lawfully be considered in evaluating Plaintiff's existing call-center work; it challenges GEICO's separate decision to make that metric an absolute gateway to competing for other jobs.

Hickey v. Government Employees Insurance Company d/b/a GEICO

202. GEICO's conduct violated 42 U.S.C. § 12112(b)(6) and 29 C.F.R. § 1630.10.

203. Plaintiff seeks declaratory, injunctive, back-pay, and other make-whole relief legally available for this Count. Plaintiff seeks compensatory or punitive damages only to the extent the same conduct supports a separate intentional-discrimination or failure-to-accommodate claim for which such damages are available.

**COUNT III - ADA DISPARATE IMPACT: CURRENT-ROLE CUSTOMER-BIAS METRIC AND INDEPENDENT CROSS-JOB SCREEN-OUT**

204. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

205. GEICO maintained a facially neutral five-factor composite survey regime consisting of: (a) subjective customer surveys; (b) an 'excellent-only' scoring rule and approximately 77 percent threshold; (c) customer-survey results constituting approximately one-half of an employee's overall performance rating; (d) no meaningful appeal, neutral review, or disability-bias screening process; and (e) rolling terminations, approximately every six months, affecting the bottom 10 percent to 25 percent of the call-center floor. The third feature amplified any bias embedded in the survey inputs until it materially shaped the overall employment rating; the fifth supplied the recurring job-loss consequence that gave the first four features coercive and potentially job-ending force.

205A. For this current-role theory, the five factors constitute one inseparable composite employment practice. Plaintiff makes no allegation and seeks no ruling concerning the lawfulness or impact of a hypothetical version from which any one factor had been removed. His allegation is that the actual five-factor practice, as GEICO operated it, caused the unlawful disparate impact alleged in this Count. The independent cross-job screen-out theory in paragraph 208 does not depend on that no-position limitation.

206. All five features operating together produced the first, independent disparate impact within Plaintiff's existing call-center position. The composite practice allowed customers' unreviewed reactions to disability-linked communication manifestations to enter GEICO's performance system, converted every response below 'excellent' into the same practical failure, assigned that survey result approximately one-half of the overall performance rating, denied meaningful correction or bias review, and then used the resulting rating in ranking, discipline, job jeopardy, and rolling termination. A facially neutral mathematical formula did not eliminate the discriminatory effect of disability-sensitive customer reactions embedded in its heavily weighted inputs.

207. This current-role use disproportionately harmed and tended to screen out employees whose disabilities affect speech, pace, tone, affect, tics, psychiatric presentation, neurological functioning, or customer perception, including Plaintiff. This theory challenges the composition and operation of GEICO's performance criterion itself. It does not depend on GEICO's later use of that criterion in internal hiring, and it does not seek a lower lawful performance standard. Plaintiff alleges that no legitimate standard required GEICO to count disability-biased customer reactions as deficient performance or to treat those reactions as indistinguishable from genuine service failures.

208. GEICO caused a second and independently sufficient disparate impact when it exported the survey-derived metric from the call-center performance system and used it as an absolute prerequisite for access to internal applications for materially different positions. The metric thereby screened Plaintiff out before any role-specific consideration of his qualifications, although GEICO had not established that customer ratings from his call-center position were job-related and consistent with business necessity for the

Hickey v. Government Employees Insurance Company d/b/a GEICO

positions he sought. Even if GEICO could justify some use of the metric in the current role, that would not establish its validity for each different position in question.

209. The same-performance-standards rationale does not defeat either disparate-impact theory. The current-role theory alleges that GEICO's chosen method of measurement gave employment force to unreviewed disability-biased customer reactions; the cross-job theory alleges that GEICO separately used the resulting metric as a qualification screen without role-specific justification. GEICO did not use safeguards that could have prevented the respective discriminatory effects, including neutral bias review and an appeal process for current-role inputs or role-specific validation instead of automatic carryover into materially different positions. Each challenged use caused a distinct injury and remains actionable even if GEICO disputes or defeats the other. Plaintiff pleads the related reasonable-accommodation theory separately in Count I.

209A. Customer-sourced rating systems are not categorically immune from disparate-impact scrutiny. In Liu v. Uber Technologies, Inc., the Ninth Circuit analyzed an allegation that Uber's use of passenger star ratings to deactivate drivers was an employment practice through which customer racial bias could affect termination decisions. Nos. 22-16507, 22-16712, 2024 WL 3102801, at *1-5 (9th Cir. June 24, 2024) (unpublished). Although Liu involved Title VII race discrimination rather than ADA disability discrimination and is persuasive rather than binding authority, the court did not hold that an employer's customer-sourced rating system was categorically beyond disparate-impact law.

209B. Uber prevailed in Liu because the particular anecdotes, general studies, and counsel survey pleaded there did not plausibly establish a significant Uber-specific disparity causally connected to the rating practice; the survey used the wrong denominator and contained other design defects. Id. at *2-5. The panel nevertheless stated that statistics are not strictly necessary at the pleading stage and acknowledged that rating-bias literature raised an important concern that could support causation when paired with an adequately pleaded employer-specific disparity. Id. at *2-3 & n.2.

209C. The deficiencies identified in Liu are not the facts alleged here. Plaintiff identifies GEICO's five-factor composite regime and alleges a treating psychiatrist's individualized medical nexus; known customer comments concerning disability-linked presentation; full recorded calls linked to customer ratings and comments, permitting call-level comparison; an excellent-only scoring rule and approximately 77 percent threshold; survey results constituting approximately one-half of overall performance; no meaningful bias review or appeal; rolling-termination and cross-job application-screening consequences; and GEICO-controlled workforce-wide data from which properly denominated comparisons can be calculated in discovery. These allegations describe a concrete, GEICO-specific causal mechanism rather than an inference based only on generalized literature or an improperly designed counsel survey.

210. Plaintiff brings this Count only for his own injuries. He does not seek to represent a class pro se.

211. GEICO's two independently challenged policy uses violated the ADA, including 42 U.S.C. §§ 12112(a), 12112(b)(3)(A), and 12112(b)(6), and 29 C.F.R. § 1630.10(a). Plaintiff pleads GEICO's related failure to accommodate separately in Count I.

212. Plaintiff seeks declaratory, injunctive, back-pay, and other make-whole relief legally available for this Count. Compensatory and punitive damages are sought only under other counts for which such damages are legally available.

Hickey v. Government Employees Insurance Company d/b/a GEICO

## COUNT IV - ADA INTENTIONAL DISABILITY DISCRIMINATION AND DISPARATE TREATMENT, INCLUDING STEREOTYPE-BASED LIMITING AND CLASSIFICATION

213. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

214. GEICO's internal mobility policy allowed case-by-case exceptions to performance-related posting prerequisites, demonstrating that GEICO had discretion to conduct individualized review.

215. When Plaintiff requested a medically supported disability-related exception, GEICO treated the survey metric as categorically non-waivable for posting out.

216. Direct and circumstantial evidence supporting discriminatory intent includes Mia's shift from sending non-call-center postings to instructing Plaintiff not to apply and pressuring him toward a lower-paid mailroom role; the alleged distinction between accommodations for physical and psychiatric disabilities; Danny's disability-based comments and premature lay rejection of Plaintiff's disclosed disability nexus while the request was pending; GEICO's continued disregard of the treating psychiatrist's later medical nexus without contrary medical evidence or targeted clarification; Melissa's alleged autism-related remark; and GEICO's refusal to conduct a role-specific assessment despite its case-by-case exception policy.

216A. GEICO substituted generalized assumptions about psychiatric disability for an individualized, role-specific assessment. Danny allegedly treated manifestations Plaintiff attributed to bipolar disorder as matters of choice or character through his black-hair/changeability analogy, dismissed Plaintiff's disability explanation as a 'survey excuse,' described Plaintiff as a 'bad performer,' and generalized from call-center survey difficulties to a purported inability to perform any role involving customer interaction. Mia's alleged physical-versus-psychiatric distinction and Melissa's alleged autism-related remark further support a plausible inference that GEICO evaluated mental disabilities through categorical assumptions rather than individualized functional evidence.

216B. GEICO's later Position Statement repeated and exposed the same stereotype by asserting that Plaintiff "suggests that he was unable to interact with customers (an essential function of his position), either with or without reasonable accommodation." GEICO Position Statement at 5. That post hoc framing transformed episodic effects on a blunt survey instrument into global incapacity, ignored the narrower medical nexus and requested application-process modification, and was contradicted by Plaintiff's demonstrated customer-facing performance, including his later Liberty Mutual results. Plaintiff alleges that the overstatement was pretext used to defend GEICO's refusal to assess the actual limitation and requested modification.

216C. GEICO allegedly acted on those assumptions by maintaining the disability-impacted survey score as an application barrier, instructing Plaintiff not to apply for identified positions, channeling and pressuring him toward materially lower-paid mailroom work, escalating performance action tied to disability-affected manifestations, warning of termination, and refusing an individualized assessment of the positions Plaintiff wished to pursue. Those allegations plead that GEICO limited and classified Plaintiff in ways that adversely affected his employment opportunities and status because of disability.

216D. Plaintiff pleads this theory separately and in the alternative to retaliation. Count IV addresses actions allegedly taken because of Plaintiff's disability and GEICO's disability-based assumptions; Count V addresses actions allegedly taken because Plaintiff requested accommodation and opposed

Hickey v. Government Employees Insurance Company d/b/a GEICO

discrimination. The same course of conduct may support both inferences, but the legal theories are distinct.

217. Plaintiff's intentional-discrimination claim does not depend on an unidentified comparator. The alleged disability-focused statements, abrupt shift from identifying openings to instructing Plaintiff not to apply, physical-versus-psychiatric distinction, lower-paid channeling, performance escalation, and refusal to conduct role-specific review support a plausible inference that, but for Plaintiff's disability and GEICO's assumptions about it, GEICO would not have limited or classified Plaintiff in the alleged manner.

218. GEICO's conduct violated 42 U.S.C. § 12112(a) and § 12112(b)(1), including the prohibitions against disability discrimination in job application procedures, advancement, classification, and other terms, conditions, and privileges of employment, and against limiting or classifying an employee in a way that adversely affects employment opportunities or status because of disability.

219. As a direct and proximate result, Plaintiff suffered lost employment opportunities, lost wages and benefits, emotional distress, worsening medical symptoms, constructive discharge, and other damages legally available for intentional discrimination.

**COUNT V - ADA RETALIATION: WORKPLACE RETALIATION FOR ACCOMMODATION ACTIVITY AND FALSE/MATERIALLY MISLEADING VEC REPORTING IN RESPONSE TO PROTECTED RESIGNATION-LETTER OPPOSITION**

220. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

221. Plaintiff engaged in protected ADA activity known to GEICO by requesting accommodation, submitting medical documentation, participating in the accommodation process, memorializing the April 30 denial in writing, and opposing disability discrimination and lack of accommodation in his May 12 resignation letter. For the VEC-reporting branch of this Count, the most immediate protected act and the specific object of the alleged retaliation was Plaintiff's May 12 resignation letter.

222. GEICO took materially adverse actions after and because of Plaintiff's protected activity, including pressure toward a lower-paid demotion, disability-based stereotyping, performance escalation tied to disability-affected metrics, constructive discharge, and materially false or misleading VEC reporting.

222A. The workplace retaliation began almost immediately after Plaintiff initiated the accommodation process and while the request remained pending. After initially identifying non-call-center openings, Mia consulted management, told Plaintiff not to apply because applications would be automatically blocked or denied under the existing survey/performance prerequisites while no accommodation had been approved, and pressured him toward lower-paid mailroom work. Danny shortly thereafter told Plaintiff to assume the request would be denied, repeated the pressure toward materially lower-paid work, urged resignation, warned of termination if scores did not improve, and escalated performance action. The close temporal proximity, management knowledge, abrupt change in treatment, and express linkage to the pending request support a plausible inference that Plaintiff's protected accommodation activity was a but-for cause of this materially adverse course of conduct, which could dissuade a reasonable employee from requesting or continuing to pursue ADA accommodation.

223. GEICO's May 23 and May 29, 2025 VEC reporting was not merely an ordinary benefits dispute. SIDES specifically asked what reason Plaintiff gave for leaving. Plaintiff alleges that GEICO responded to the protected opposition in his May 12 resignation letter by attributing ordinary job dissatisfaction to

Hickey v. Government Employees Insurance Company d/b/a GEICO

him, concealing the letter's accommodation and constructive-discharge explanation, acknowledging the written resignation, and failing to provide it.

223A. The asserted causal connection is content-specific. The protected act said that GEICO denied meaningful accommodation and interactive process; the alleged adverse act purported to tell the VEC why Plaintiff resigned while erasing those accusations and replacing them with a sanitized reason. Plaintiff therefore alleges not merely that the report followed protected activity, but that the report targeted and altered the protected opposition itself.

224. A reasonable worker could be dissuaded from requesting ADA accommodation, memorializing discrimination, or opposing discrimination if the employer responded by concealing the accommodation record and mischaracterizing the employee's resignation before a state agency.

225. The timing and exact correspondence between the protected act and the adverse act support causation. The initial SIDES transmission followed the protected May 12 resignation letter by only eleven days, and the amended transmission followed it by seventeen days. More importantly, the challenged response purported to state Plaintiff's own reason for resigning while contradicting the protected explanation in his letter and withholding that letter after acknowledging its existence.

225A. GEICO's later defense that the EEOC charge postdated the SIDES transmissions does not defeat the retaliation theory pleaded here. Plaintiff relies on protected activity that occurred before the transmissions, culminating in the May 12 resignation letter, rather than on the later EEOC charge. The letter's content, GEICO's admitted knowledge that a written resignation existed, the eleven-day interval, the failure to attach the requested document, the contradictory replacement narrative, and the renewed May 29 transmission together support a reasonable inference of but-for causation.

226. GEICO's explanations are pretextual because they conflict with contemporaneous documents, including the May 1 email, GEICO's internal April 30 note, the case-by-case exception policy, the resignation letter, and the VEC contradictions alleged above.

227. GEICO violated 42 U.S.C. § 12203(a). This claim is supported by Burlington Northern, Foster, Darveau, and Robinson v. Shell Oil Co., 519 U.S. 337 (1997).

228. For this retaliation Count, Plaintiff seeks the equitable remedies legally available under the ADA, including back pay, front pay where appropriate, correction or retraction of materially false separation records, injunctive relief, and other make-whole equitable relief. Plaintiff does not seek compensatory or punitive damages solely under this Count.

## COUNT VI - ADA HOSTILE WORK ENVIRONMENT AND DISABILITY HARASSMENT

229. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

230. Plaintiff is a qualified individual with a disability for purposes of this claim during the relevant period.

231. Plaintiff was subjected to unwelcome harassment based on disability and protected ADA activity. The harassment included alleged disability-stereotyping comments by Danny Iwuji, Danny's premature lay rejection of Plaintiff's disclosed disability nexus while the request was pending, GEICO's continued disregard of the treating psychiatrist's later medical nexus without contrary medical evidence or targeted clarification, pressure toward a lower-paid demotion or resignation, the

Hickey v. Government Employees Insurance Company d/b/a GEICO

announced June termination deadline, performance escalation tied to disability-affected symptoms, condescending HR statements about the ADA, and Melissa Miiller's alleged autism-related remark.

232. The conduct was sufficiently severe or pervasive, viewed in context, because it came from supervisors and HR during an active ADA accommodation process, attacked Plaintiff's disability-related symptoms, pressured him away from his job, and worsened his mental health.

233. The conduct interfered with Plaintiff's work performance and medical stability, contributed to FMLA/leave exhaustion, and made continued employment objectively intolerable.

234. GEICO is liable because the alleged conduct was by supervisors and HR personnel acting within the scope of employment and because GEICO did not investigate or correct the alleged conduct after Plaintiff memorialized it in writing.

235. GEICO violated the ADA as recognized in Fox and Jessup.

236. As a direct and proximate result, Plaintiff suffered emotional distress, worsening disability symptoms, constructive discharge, lost wages, and other damages.

## COUNT VII - ADA DISCRIMINATION AND RETALIATION RESULTING IN CONSTRUCTIVE DISCHARGE

237. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

238. The alleged constructive discharge arose from the cumulative effect of GEICO's disability-based denial of accommodation; refusal to assess the requested survey/posting modification on an individualized basis; instruction that Plaintiff should assume denial; pressure toward a materially lower-paid position; hostile and disability-stereotyping remarks; continued exposure to the unaccommodated survey and rolling-termination system; and what management communicated was impending termination under that system. Those acts did not merely make work unpleasant. Taken together with Plaintiff's acute psychiatric deterioration, exhausted leave, absence of vacation or personal time, and recurring bathroom-need-versus-discipline dilemma, they left no medically safe or practically viable way to continue under GEICO's existing, unaccommodated call-center conditions and made those conditions objectively intolerable.

239. By May 12, 2025, Plaintiff alleges that he had exhausted the FMLA leave available to him; GEICO's final pay statement recorded zero available sick, vacation, and floating-holiday balances; and GEICO had eliminated personal time. His bipolar disorder had severely deteriorated, including severe insomnia, suicidal thoughts, and pre-psychotic symptoms, and continued exposure to the unaccommodated call-center environment was producing immediate psychiatric and physical consequences. Continued work under those conditions had become physically and psychiatrically unsustainable and threatened psychosis, hospitalization, and further serious deterioration; it had not become merely undesirable.

240. The physical consequences were concrete and recurring. GEICO's bathroom-break policy required Plaintiff either to use sick or vacation time, remain on the phones through an urgent bowel need, or leave the phones and incur an attendance occurrence and possible discipline. Plaintiff had already been forced to defecate in his clothing on at least one occasion rather than incur discipline. With available FMLA leave exhausted, sick and vacation balances at zero, and personal time completely eliminated, continued work would have forced Plaintiff to defecate in his clothing every workday or incur repeated attendance violations and discipline. That daily forced choice compounded

his severe bipolar deterioration and made continued exposure to the existing conditions medically and physically untenable.

241. A reasonable person in Plaintiff's position—confronted with GEICO's knowledge of his disability and the treating psychiatrist's medical nexus, the complete deterioration of his mental health, suicidal thoughts and pre-psychotic symptoms, exhausted FMLA leave, zero sick and vacation balances, eliminated personal time, daily bodily humiliation or discipline, categorical rejection of the requested path away from the disability-affected barrier, pressure toward a materially lower-paid position, and impending termination under the unaccommodated metric—would have felt compelled to resign. Plaintiff resigned on May 12, 2025 because GEICO had left no tolerable means of preserving both his employment and his health. His resignation letter expressly identified the lack of meaningful accommodation and interactive process, the resulting destruction of his mental health, and constructive discharge. The constructive discharge was causally linked to GEICO's alleged ADA violations and protected-activity retaliation. See Pennsylvania State Police v. Suders, 542 U.S. 129, 141-43 (2004); Green v. Brennan, 578 U.S. 547, 555-56 (2016); EEOC v. Consol Energy, Inc., 860 F.3d 131, 143-45 (4th Cir. 2017).

242. Plaintiff's acute inability to continue safely under GEICO's unaccommodated call-center conditions did not mean that he was permanently unable to work, generally unable to interact with customers, unable to perform the essential functions of his position with reasonable accommodation, or unqualified for the non-call-center positions for which he sought equal access to compete. Plaintiff alleges that he remained qualified with accommodation and, independently, qualified to compete for the desired positions, but that GEICO's alleged discrimination and retaliation made continued work under the conditions it actually imposed intolerable. As a direct and proximate result of the constructive discharge, Plaintiff suffered lost wages and benefits, emotional distress, worsening medical symptoms, and other legally available relief.

## COUNT VIII - ADA INTERFERENCE, COERCION, INTIMIDATION, OR THREATS

243. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

244. Plaintiff was exercising and enjoying rights protected by the ADA by requesting accommodation, participating in the interactive process, and seeking disability-neutral access to GEICO's internal application and posting process. Danny knew that Plaintiff had disclosed bipolar disorder and that the accommodation request remained pending with HR.

244A. Because and on account of Plaintiff's exercise of those ADA rights, GEICO, through Danny, coerced, intimidated, threatened, and interfered with Plaintiff by directing him to assume the request would be denied, repeatedly pressuring him to resign or accept a lower-paid mailroom or clerk position, warning that he would be terminated by June if scores did not improve, stating that no one had put a gun to his head and forced him to work at GEICO, threatening performance memoranda, and escalating discipline for disability-related manifestations.

244B. The conduct was intended, and was objectively reasonably likely, to pressure Plaintiff to abandon or curtail the accommodation process, forgo equal access to compete for other positions, accept materially inferior work, or resign. Discriminatory intent is further supported by Danny's black-hair/changeability analogy, his dismissal of Plaintiff's medical explanation as a survey excuse, his assertion that he could prove the problem was not disability without identifying supporting evidence, and his alleged global declaration that Plaintiff was unsuited for any customer-interaction role.

244C. GEICO's later categorical denial, failure to address Plaintiff's May 1 clarification of the actual requested modification, and continued application of the disability-impacted survey prerequisite reinforced the coercive message that Plaintiff could not obtain meaningful accommodation and instead had to accept inferior work, remain exposed to termination, or leave GEICO.

244D. GEICO separately interfered with Plaintiff's ADA rights through Mia and the management personnel she consulted. While Plaintiff's accommodation request remained pending and unapproved, GEICO, through Mia, instructed Plaintiff not to submit applications for positions she had identified because the applications would be automatically blocked or denied under the unmodified survey/performance prerequisites. Almost immediately after the accommodation request, GEICO also redirected and pressured Plaintiff toward materially lower-paid work. Because GEICO controlled both the application gateway and the accommodation-decision process, this instruction and pressure were intended, and were objectively reasonably likely, to cause Plaintiff to forgo or curtail the exercise of his right to seek accommodation and disability-neutral access to the internal-application process; Plaintiff in fact refrained from submitting applications he otherwise would have submitted. This course of conduct is pleaded under 42 U.S.C. § 12203(b) because of its deterrent and obstructive effect, independently of, and in addition to, its retaliatory character under § 12203(a).

245. GEICO's alleged post-employment VEC conduct further interfered with Plaintiff's ADA rights by attempting to erase or replace the record of protected activity and constructive discharge.

246. GEICO's conduct violated 42 U.S.C. § 12203(b).

247. Plaintiff seeks the equitable remedies legally available for this Count and does not seek compensatory or punitive damages solely under this Count.

## COUNT IX - ADA DISPARATE TREATMENT THROUGH GEICO'S KNOWING ADOPTION OF DISABILITY-BIASED CUSTOMER RATINGS AND COMMENTS

248. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

249. Plaintiff was a qualified individual with a disability, and GEICO knew of Plaintiff's bipolar disorder and his medically documented disability-related communication manifestations.

250. GEICO designed, solicited, collected, controlled, and used customer ratings and comments as employment-decision inputs. Customer-survey results constituted approximately half of Plaintiff's performance score and were used in ranking, discipline, termination-risk, and internal application and advancement decisions.

251. GEICO's survey scale offered 'poor,' 'fair,' 'good,' 'very good,' and 'excellent,' but GEICO treated every response below 'excellent' as functionally failing. Thus, a customer could impose the same adverse employment consequence by selecting 'very good' instead of 'excellent' as by selecting an overtly negative rating. When the percentage of 'excellent' responses fell below approximately 77 percent, the result exposed Plaintiff to job jeopardy, public ranking, discipline, rolling termination consideration, and internal-mobility restrictions.

252. Plaintiff alleges that GEICO's survey records contain specific customer comments concerning disability-linked aspects of his speech or presentation, including at least one known complaint concerning his 'call opening.' Plaintiff no longer has access to GEICO's survey systems; the complete wording, dates, ratings, and internal handling records are within GEICO's possession, custody, or control and will need to

Hickey v. Government Employees Insurance Company d/b/a GEICO

be produced in discovery. Plaintiff further alleges that customer feedback included implicit reactions to manifestations of his bipolar disorder, including speech, pace, tone, affect, tics, and psychiatric presentation. A discriminatory reaction did not require a slur or a nominally 'poor' rating: withholding 'excellent' because of discomfort with a disability manifestation produced the same practical penalty.

253. GEICO provided no meaningful process for Plaintiff to appeal, correct, remove, or obtain neutral review of a customer rating or comment that reflected disability bias, misunderstanding, or hostility. GEICO's system therefore treated a legitimate service concern and a disability-based customer reaction as equivalent whenever both produced a response below 'excellent.'

254. GEICO received individualized medical notice of this precise problem. Plaintiff's treating psychiatrist explained that his disability could cause communication difficulties reflected in customer surveys, that survey fluctuations appeared medically related, and that the surveys might not accurately reflect Plaintiff's capabilities or professional potential.

255. Plaintiff requested a limited safeguard against using the disability-impacted survey metric as an absolute prerequisite for internal applications. He did not request a guaranteed interview or promotion. His separate challenge to GEICO's current-role use of customer ratings does not depend on his having requested a lower performance standard; it rests on GEICO's own knowing decision, after individualized medical notice, to continue assigning employment consequences to unreviewed disability-linked customer reactions.

256. GEICO did not obtain contrary medical evidence or identify a legitimate defect in the treating psychiatrist's survey nexus. Instead, a nonmedical supervisor allegedly asserted that he could prove the documented effects were not caused by the disability, and GEICO continued to use the unreviewed survey inputs.

257. GEICO retained control over the employment consequences of customer feedback and maintained discretion to consider exceptions to internal-mobility prerequisites on a case-by-case basis. Nevertheless, after receiving specific medical notice, GEICO treated the survey barrier as categorically non-waivable for Plaintiff and did not provide a bias review, individualized override, or role-specific assessment.

258. GEICO therefore did more than permit customers to express opinions. By deliberately giving unreviewed, disability-tainted customer reactions decisive employment force after notice of the medical nexus, GEICO adopted and implemented those reactions as its own judgments concerning Plaintiff's performance, continued employment, and eligibility to compete for advancement. GEICO could not avoid its ADA obligations by outsourcing a decisive part of its employment process to unreviewed customer bias.

258A. The pleaded wrong is not merely that a customer may have harbored bias. It is GEICO's own decision, after individualized medical notice and with access to the underlying calls and comments, to ratify the customer reaction by converting it into ranking, discipline, rolling-termination, and application-screening consequences without separating actual service quality from disability-linked customer reaction.

259. GEICO's use of the customer-survey system denied Plaintiff equal access to internal application and advancement opportunities, subjected him to discipline and termination risk, and contributed to the objectively intolerable conditions that resulted in his constructive discharge.

Hickey v. Government Employees Insurance Company d/b/a GEICO

260. Plaintiff alleges that disability was a but-for cause of this treatment: absent Plaintiff's disability manifestations and the disability-based customer reactions GEICO knowingly converted into employment consequences, the challenged barriers and penalties would not have been imposed. Disability need not be the sole cause. See Gentry v. E.W. Partners Club Mgmt. Co., 816 F.3d 228, 234-36 & n.5 (4th Cir. 2016).

261. This Count is distinct from Count III. Count III alleges two independent disparate-impact applications of a facially neutral policy: its use in current-role performance and rolling-termination decisions, and its separate use as an internal-application screen for materially different jobs. This Count alleges intentional disparate treatment because, after individualized medical notice, GEICO knowingly chose to incorporate disability-linked customer reactions into its own employment decisions without review, correction, or individualized assessment. See Raytheon Co. v. Hernandez, 540 U.S. 44, 52-53 (2003) (distinguishing intent-based disparate treatment from disparate impact).

262. An ostensibly neutral downstream formula does not necessarily cleanse biased evaluations embedded in its inputs. Cf. Thomas v. Eastman Kodak Co., 183 F.3d 38, 53-56 (1st Cir. 1999). Nor does the absence of personal hostility eliminate intentional discrimination when an employer consciously makes employment decisions on a protected-trait basis. Cf. Ferrill v. Parker Group, Inc., 168 F.3d 468, 472-73 (11th Cir. 1999).

263. GEICO's conduct violated 42 U.S.C. § 12112(a) and § 12112(b)(1), which prohibit disability discrimination in job application procedures, advancement, discharge, and other terms, conditions, and privileges of employment, including limiting or classifying an employee in a way that adversely affects his opportunities or status because of disability.

264. As a direct and proximate result, Plaintiff suffered lost employment and advancement opportunities, lost wages and benefits, emotional distress, worsening medical symptoms, constructive discharge, and other damages and equitable relief legally available for intentional discrimination.

## COUNT X - VIRGINIA HUMAN RIGHTS ACT DISABILITY DISCRIMINATION AND DENIAL OF EMPLOYMENT OPPORTUNITIES

265. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

266. At all relevant times, GEICO was an employer, Plaintiff was an employee and person with a disability, and Plaintiff was otherwise qualified within the meaning of the Virginia Human Rights Act.

267. GEICO limited or classified Plaintiff in a way that deprived or tended to deprive him of employment and advancement opportunities because of disability by using a disability-impacted customer-survey prerequisite as an automatic application barrier, instructing him not to submit applications that would be automatically denied, and refusing individualized consideration of a disability-related exception.

268. GEICO otherwise discriminated against Plaintiff in the terms, conditions, and privileges of employment by converting disability-linked customer reactions into discipline, termination risk, and denial of equal access to internal application and advancement procedures.

269. Plaintiff alleges that disability was a motivating factor in the challenged employment practices even if GEICO contends that additional factors also motivated them.

270. GEICO's conduct violated Va. Code § 2.2-3905(B)(1)(a)-(b) and (6).

271. Plaintiff seeks the compensatory, punitive, equitable, fee, and cost remedies legally available under Va. Code § 2.2-3908, without double recovery for injuries also remedied under federal law.

## COUNT XI - VIRGINIA HUMAN RIGHTS ACT DENIAL OF ACCOMMODATION-RELATED OPPORTUNITIES, ACCOMMODATION RETALIATION, AND FAILURE TO ENGAGE IN A TIMELY GOOD-FAITH INTERACTIVE PROCESS

272. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

273. Plaintiff requested a disability-related modification of the survey/posting prerequisite so he could compete for identified non-call-center positions. He did not request guaranteed selection, and he was otherwise qualified to compete for the particular employment opportunities alleged above.

274. GEICO denied employment or promotion opportunities because considering Plaintiff for those opportunities would require accommodation of the disability-impacted prerequisite. GEICO treated the barrier as categorically non-waivable rather than conducting an individualized review of Plaintiff, the identified positions, or available exceptions.

275. After Plaintiff requested accommodation and while he remained employed, GEICO took adverse action against him, including pressure toward an unaffordable demotion, disability-based discouragement and stereotyping, and performance escalation tied to the disability-affected metric.

276. GEICO failed to engage in a timely, good-faith interactive process concerning the accommodation actually requested. It did not timely determine whether the survey/posting modification was reasonable and, after treating that modification as unavailable, did not discuss an effective alternative that would provide equal access to compete, such as a case-by-case exception, application-process modification, or meaningful reassignment review.

277. GEICO's conduct violated Va. Code § 2.2-3905.1(B)(2), (3), and (5). To the extent the requested modification and reassignment process were necessary to assist Plaintiff in performing an identified non-call-center position, GEICO also refused reasonable accommodation in violation of § 2.2-3905.1(B)(1).

278. Plaintiff seeks the compensatory, punitive, equitable, fee, and cost remedies legally available under Va. Code § 2.2-3908, without double recovery for injuries also remedied under federal law.

## VII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant GEICO and award the following relief:

- A declaration that GEICO violated the ADA and the Virginia Human Rights Act through the unlawful conduct alleged in this Complaint, including failure to accommodate, denial of equal access to compete, use of a disability-screening selection criterion, intentional discrimination, retaliation, disability-based hostile treatment, failure to engage in a timely good-faith interactive process, and constructive discharge;
- Back pay, front pay where appropriate, lost benefits, lost employment opportunities, pre-judgment and post-judgment interest, and all make-whole relief available under the ADA and the Virginia Human Rights Act;
- Compensatory damages for emotional distress, medical deterioration, reputational harm, and other non-economic injuries to the extent available under the ADA and the Virginia Human Rights Act, but

Hickey v. Government Employees Insurance Company d/b/a GEICO

not as standalone relief under federal counts for which such damages are unavailable and without double recovery for overlapping injuries;

- Punitive damages to the extent legally permitted under applicable federal and Virginia law, based on GEICO's alleged reckless indifference to protected rights;
- Equitable relief requiring GEICO to correct or retract materially false separation records, including any internal or VEC-related record that describes Plaintiff's resignation as ordinary job dissatisfaction while omitting the ADA accommodation and constructive-discharge context;
- Equitable relief requiring GEICO, where feasible, to reconsider Plaintiff for appropriate employment opportunities without the challenged disability-impacted internal-posting barrier and without guaranteed selection;
- Appropriate injunctive or equitable relief concerning the review of disability-impacted customer surveys and the use of unreviewed survey results as absolute employment barriers, to the extent Plaintiff has standing and such relief is legally available;
- Costs, and reasonable attorneys' fees if counsel appears and such fees are legally available under the ADA or the Virginia Human Rights Act, together with any other relief the Court deems just and proper.


## VIII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Respectfully submitted,

_Joseph L. Hickey III_

Joseph L. Hickey III

7823 Richfield Road

Springfield, Virginia 22153

Telephone: (571) 800-7982

Email: hopelikefire1@gmail.com

Plaintiff, pro se

Date: 08/07/2025


Complaint - Page 37

Hickey v. Government Employees Insurance Company d/b/a GEICO

## LOCAL CIVIL RULE 83.1(N) CERTIFICATION

I declare under penalty of perjury that:

(1) No attorney has prepared, or assisted in the preparation of this document.

Joseph L. Hickey III
Name of Pro Se Party (Print or Type)

Signature of Pro Se Party

Executed on: 05/07/2025 (Date)