**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF VIRGINIA**

**ALEXANDRIA DIVISION**

FILED
MAILROOM
AUG 25 2026
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

JOSEPH L. HICKEY III,

Plaintiff,

v.

GOVERNMENT EMPLOYEES INSURANCE COMPANY d/b/a GEICO,

Defendant.

Civil Action No. 1:26-cv-02459-LMB-WEF

FIRST AMENDED COMPLAINT

DEMAND FOR JURY TRIAL

Plaintiff Joseph L. Hickey III, proceeding pro se, amends his Complaint once as a matter of course under Federal Rule of Civil Procedure 15(a)(1) and brings this action against Defendant Government Employees Insurance Company d/b/a GEICO under Titles I and V of the Americans with Disabilities Act of 1990, as amended (ADA), 42 U.S.C. §§ 12101 et seq., and the Virginia Human Rights Act (VHRA), Va. Code §§ 2.2-3900 et seq. Plaintiff alleges as follows:

## I. NATURE OF THE ACTION

1. This case concerns equal access to compete for internal positions, not a demand for an automatic promotion, guaranteed transfer, or waiver of Plaintiff's current-job duties.
2. Plaintiff has bipolar disorder, an episodic psychiatric disability that, when active, substantially limits communicating. His treating psychiatrist explained that episodic mood instability could affect speech patterns, energy levels, and communication consistency in a high-pressure call center and could be reflected in customer-satisfaction surveys.

3. GEICO used a rigid customer-survey metric both to evaluate Plaintiff's call-center work and as a prerequisite to internal posting. Plaintiff requested a limited modification: do not use that disability-affected call-center metric as an absolute barrier to applications for materially different, non-call-center jobs where the metric was not job-related.

4. GEICO's internal-mobility policy allowed case-by-case exceptions. Plaintiff alleges that, when he sought a medically supported exception, GEICO instead treated the survey prerequisite as categorically non-waivable, instructed him not to apply through the blocked process, and never completed an individualized review of his requested application-access modification.

5. The case also challenges GEICO's five-factor customer-survey regime: subjective ratings; an excellent-only rule and approximately 77-percent threshold; surveys constituting approximately half of the overall performance rating; no meaningful appeal or bias review; and rolling termination reviews affecting the bottom 10 to 25 percent of the call-center floor approximately every six months.

6. After supervisors allegedly pressured Plaintiff toward demotion or resignation while the accommodation request was pending, his mental health deteriorated, his medical leave was exhausted, and he resigned on May 12, 2025. His letter expressly identified no meaningful accommodation or interactive process and stated that he considered the resignation a constructive discharge.

7. Eleven days later, GEICO or its unemployment administrator acknowledged the written resignation in a SIDES response to the Virginia Employment Commission (VEC), did not attach it, and substituted an ordinary job-dissatisfaction account for its ADA and constructive-discharge explanation. Plaintiff alleges that the manner of reporting was retaliation for the protected opposition in that letter.

## II. PARTIES, JURISDICTION, VENUE, AND EXHAUSTION

8. Plaintiff Joseph L. Hickey III resides in Springfield, Virginia. GEICO employed him from approximately January 2021 through May 12, 2025.

9. Defendant Government Employees Insurance Company does business as GEICO and, on information and belief, employed more than fifteen employees at all relevant times. GEICO acted through its Human Resources personnel, supervisors, managers, corporate representatives, and authorized unemployment administrator.

10. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 12117(a), and supplemental jurisdiction over the related VHRA claims under 28 U.S.C. § 1367(a).

11. Venue is proper under 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3), incorporated by 42 U.S.C. § 12117(a), because the challenged employment practices occurred in Virginia, Plaintiff worked in Virginia, and relevant employment records are maintained in Virginia.

12. The relevant workplace was at or near One GEICO Boulevard in Stafford County, Virginia, within the Alexandria Division. If another division is determined to be more appropriate, Plaintiff requests intradistrict transfer rather than dismissal.

13. Plaintiff filed EEOC Charge No. 570-2025-02807 and an amended charge naming GEICO and alleging disability discrimination and retaliation, including denial of accommodation, application-process exclusion, hostile treatment, constructive discharge, disparate impact, disparate treatment, and the May 29, 2025 VEC submission.

14. The EEOC issued a Determination and Notice of Rights on May 29, 2026, which Plaintiff received through the EEOC portal that day. This action was timely filed within ninety days. The charge was also presented to the Virginia Office of Civil Rights, and the Notice supplies the applicable VHRA notice. The Notice may be filed separately as Exhibit A.

15. The claims in this pleading were stated in, are reasonably related to, or would have followed from a reasonable investigation of the charge. See Sydnor v. Fairfax County, 681 F.3d 591, 594–95 (4th Cir. 2012).

## III. FACTUAL ALLEGATIONS

### A. Employment, Disability, and Qualifications

16. Plaintiff worked as a call-center associate and later a Service Representative in GEICO's Fredericksburg-area office. He was promoted to Service Representative IV in or around 2023 and performed strongly on productivity measures such as calls per hour and average handling time.

17. Plaintiff holds a Master's degree in Business Management and had more than four years of GEICO experience, company knowledge, writing and analytical ability, and a history of promotion. He was qualified to compete for analytical, administrative, underwriting, internet, executive-assistant, back-office, and other non-call-center positions subject to each job's lawful requirements.

18. Plaintiff's bipolar disorder is episodic. During the relevant period it caused or worsened involuntary tics, pressured speech, distractibility, insomnia, mood instability, and communication manifestations that could affect customer perception even when he substantively resolved a call.

19. By July 2024, GEICO had notice of Plaintiff's mental-health condition through its leave, FMLA, or i-Sight processes. Plaintiff sought an ADA accommodation in March and April 2025 after disability-linked symptoms affected customer-survey results and internal mobility.

20. In a 2024 self-evaluation, Plaintiff initially identified bipolar disorder as the reason for survey difficulty. His supervisor directed him to replace that reference with vague language such as 'personal issues outside my control.' Plaintiff alleges that the change sanitized the performance record and later enabled GEICO to portray a disability-related problem as ordinary performance.

21. Plaintiff never said that he was globally unable to interact with customers. He described strengths in customer connection, problem-solving, empathy, call navigation, and productivity, while identifying an episodic effect on a blunt customer-perception metric.

22. GEICO nevertheless later asserted in its EEOC Position Statement that Plaintiff 'suggests that he was unable to interact with customers (an essential function of his position), either with or without reasonable accommodation.' The charge did not contain that concession, and the treating psychiatrist described only occasional communication difficulties reflected in surveys.

23. Plaintiff alleges that GEICO's formulation was overbroad and pretextual. It converted episodic effects on a customer-perception instrument into global incapacity and shifted responsibility from GEICO's use of unreviewed customer reactions to Plaintiff's supposed inability to serve customers.

24. After leaving GEICO, Plaintiff obtained comparable customer-facing work with Liberty Mutual. A 2026 dashboard reflects 1,479 calls, 68 behavioral surveys, a 100-percent behavioral score, and 118.4 percent of goal. Plaintiff recalls 66 top-box responses and two other favorable responses, with none adverse. The later results are not conclusive, but they corroborate his ability to perform customer-facing work and rebut the asserted global incapacity.

**B. GEICO's Five-Factor Survey Regime and Internal-Posting Barrier**

25. GEICO evaluated call-center employees through a numerical system in which customer surveys constituted approximately fifty percent of the overall performance rating; productivity measures supplied approximately the other half.

26. Customers could rate service poor, fair, good, very good, or excellent. GEICO treated every response below excellent as functionally failing for the challenged survey calculation, and employees generally needed approximately 77 percent excellent ratings.

27. Because only excellent counted, a customer did not need to select poor or use an explicit slur to cause a penalty. Withholding excellent because of discomfort with disability-linked speech, tone, pace, affect, tics, or psychiatric presentation had the same practical effect as an overtly negative rating.

28. GEICO publicly ranked employees and, on information and belief, conducted rolling termination reviews approximately every six months affecting the bottom 10 to 25 percent of the call-center floor. Survey results therefore carried consequences for discipline, continued employment, ranking, and internal mobility.

29. GEICO offered no meaningful appeal, correction, neutral review, or disability-bias screening process for a customer response even when a comment revealed misunderstanding or hostility toward disability-linked presentation.

30. Plaintiff recalls specific survey comments about the way he spoke or presented on calls, including a complaint concerning his 'call opening.' The exact comments, ratings, dates, metadata, and associated recorded calls are controlled by GEICO and must be produced in discovery.

31. GEICO also controls workforce-wide survey data, customer comments, rankings, discipline, termination outcomes, disability and accommodation information, and application eligibility. Properly denominated data can test whether the challenged practice disproportionately disadvantaged employees whose disabilities affect communication or customer perception. Plaintiff asserts only individual claims and does not represent a class pro se.

32. GEICO's internal-mobility guidance generally required a performance rating of 3 or higher but stated that exceptions would be considered case by case. That discretion made an individualized ADA-related exception possible.

33. Plaintiff alleges that GEICO used the survey-derived performance result as a prerequisite to internal posting and thereby carried a call-center customer-perception measure into selection for materially different jobs.

**C. The Medically Supported Accommodation Request**

34. In March 2025, Plaintiff initiated GEICO's ADA process and explained that he sought an accommodation not limited to leave.

35. On April 11, 2025, Plaintiff's treating psychiatrist supplied documentation stating that Plaintiff might occasionally experience communication difficulties reflected in customer surveys; that the fluctuations appeared related to his medical condition; and that surveys might not accurately reflect his overall capabilities or professional potential.

36. The psychiatrist stated that Plaintiff's cognitive and professional strengths were more likely to be realized outside a call center and recommended that the survey-score prerequisite be waived only when he applied for internal positions outside the call center.

37. The documentation expressly stated that the request did not apply to Plaintiff's current position and that he wished to remain subject to the same current-role standard as other employees.

38. Plaintiff did not request a lower current-job standard, guaranteed interview, guaranteed promotion, or automatic placement. He requested equal access to apply and compete without a disability-affected call-center metric operating as an absolute gateway to different positions.

39. On April 14, after receiving the psychiatrist's letter, GEICO issued a cure notice calling the certification incomplete and requiring more information by April 21. The only identified item was: 'Need the provider to complete the ADA forms.'

40. The notice identified no missing diagnosis, limitation, duration, nexus, or proposed accommodation; no contradiction in the letter; and no targeted question about the application-process modification. GEICO did not identify a substantive medical deficiency or obtain contrary medical evidence.

41. GEICO's form repeatedly asked which essential functions of Plaintiff's current position he could not perform, what accommodation would enable those functions, and whether leave would help. That current-position and leave-oriented form did not fit a request expressly directed to application access for different positions.

42. Plaintiff does not claim GEICO could never seek reasonable documentation. He alleges that GEICO possessed a treating psychiatrist's nexus and targeted recommendation, but demanded a mismatched form without asking the questions necessary to evaluate the actual request.

**D. Identified Openings, Instruction Not to Apply, and Lower-Paid Channeling**

43. In March 2025, Plaintiff asked supervisor Mia Barnes-Black whether GEICO's accommodation process covered a non-leave modification that would let him seek an equal- or higher-grade non-call-center role where the disability-linked survey effect would be reduced.

44. Mia sent Plaintiff a screenshot of current openings, including Commercial Product Relations Analyst, Financial Analyst–FP&A, Commercial Underwriting Supervisor, Commercial Supervisor, a data-operations supervisor, and other non-call-center positions. Plaintiff also identified at least one other position.

45. Plaintiff was particularly interested in Commercial Product Relations Analyst, Financial Analyst–FP&A, and at least one other position for which he met posted requirements. He was prepared to submit a resume and accept ordinary role-specific competition; he does not allege entitlement to any selection.

46. After consulting management, Mia allegedly told Plaintiff not to submit higher-level applications because the normal survey and performance prerequisites would automatically block or deny them. Plaintiff refrained from applications he otherwise would have submitted.

47. Mia then shifted from identified comparable opportunities to a lower-paid mailroom or clerk position that Plaintiff could not afford and that did not match his education or experience. This pressure began almost immediately after he initiated the accommodation process and before HR resolved the request.

48. When Plaintiff asked how GEICO would accommodate an employee who became deaf, Mia allegedly said the employee could move to an internet role, but implied the same path did not apply to Plaintiff because his disability was psychiatric rather than physical.

49. Plaintiff alleges that the instruction not to apply and the channeling toward materially lower-paid work denied application access, limited him because of disability, and were reasonably likely to deter continued pursuit of accommodation.

**E. Danny Iwuji's Hostile Meeting While the Request Was Pending**

50. In mid-to-late March 2025, incoming supervisor Danny Iwuji met with Plaintiff while the ADA request was pending and directed that the conversation remain 'off the record.' Danny's knowledge caused Plaintiff to understand that management had told him about the request.

51. Danny told Plaintiff to assume the ADA request would not be approved; repeatedly pressed him to resign, seek work elsewhere, or accept a lower-paid mailroom or clerk position; and warned that Plaintiff would be terminated if his scores did not improve by June.

52. Danny stated exactly: 'No one put a gun to your head and forced you to work at GEICO.' He also explained, in substance, that Danny's own manager would not accept a statement that Danny could do nothing to change his agents' performance.

53. Plaintiff told Danny that the challenged communication behaviors were manifestations of bipolar disorder and that HR was reviewing the request. Danny pointed to his own black hair, said, 'For example, I can't change this,' and contrasted his hair with behaviors such as talking too fast, implying that Plaintiff could simply change manifestations he attributed to bipolar disorder.

54. When Plaintiff questioned the propriety of pressure toward lower-paid work during an ADA review, Danny said: 'HR can do their thing, but since it hasn't been approved yet—it's still pending—I'm just trying to give advice,' and continued pressing the lower-paid option.

55. Danny allegedly called the disability explanation a 'survey excuse,' threatened performance memoranda, described Plaintiff as a 'bad performer,' and said he could not afford Plaintiff on his team because Plaintiff's numbers would affect Danny's numbers.

56. Danny allegedly generalized from survey difficulties to a conclusion that Plaintiff was unsuited for any customer-interaction role. He also stated, 'I can prove it's not the disability,' while identifying no medical evidence, call example, or objective analysis.

57. After GEICO later received the treating psychiatrist's documentation, GEICO did not identify contrary medical evidence or seek targeted clarification of the survey nexus. A nonmedical supervisor's assertion remained the only identified rejection of the nexus.

58. Danny then issued or participated in a memorandum for a call during which Plaintiff experienced a bipolar episode and was described as distracted at the beginning of the call, allegedly without the ordinary prior coaching, documented conversation, or warning.

59. The meeting immediately worsened Plaintiff's symptoms. He told Mia that he was experiencing a flare-up and needed to log off for the day; he did not tell her then that the meeting caused the flare-up. Immediately after the meeting, he told his wife, 'I just got retaliated against.'

60. That night Plaintiff drafted a pre-resignation letter recording that management had pressured him to resign or accept lower-paid work while his request remained pending and had treated disability manifestations as matters of choice. He did not resign then because his wife urged him to wait for GEICO's formal response.

61. Plaintiff alleges that the meeting was not ordinary coaching. In context, it communicated that he should abandon the accommodation and application process, accept inferior work, remain exposed to announced termination, or leave.

**F. April 30 Meeting, May 1 Memorialization, and Eleven Days of Silence**

62. On April 30, 2025, Plaintiff met with Human Resources representative Melissa Miiller. GEICO's internal note recorded that disability was affecting surveys, that Plaintiff wanted an analytical position off the phones, and that he 'does not want to change the surveys just not let them count when he posts.'

63. The note also recorded that HR said GEICO could not remove an essential function and 'cannot remove the survey,' then redirected the discussion toward accommodations intended to improve survey results. The note therefore corroborates that GEICO understood Plaintiff's request concerned posting rather than a current-role waiver.

64. On May 1, Plaintiff sent Melissa a contemporaneous email titled 'Follow-up on ADA Accommodation Discussion.' He described bipolar-related tics and communication symptoms affecting surveys and again proposed leaving the current-role standard intact while removing the metric as a barrier to higher-level, non-call-center applications.

65. Plaintiff recorded that Melissa said, in words or substance, that surveys were an essential job function that GEICO could not change or waive for any reason and that the approximately 77-percent metric could not be waived for posting out.

66. The email recorded discussion of coaching but explained that coaching could not remove involuntary psychiatric symptoms and would not solve the posting barrier. It also recorded Melissa's response to an autism hypothetical, in substance: 'Not sure why someone with autism would apply in the first place.'

67. Plaintiff stated that quotations were approximations and that no response was necessary because the email memorialized the conversation rather than requesting a courtesy acknowledgment. That did not prevent GEICO from correcting a material misunderstanding or informing him that the requested modification remained open.

68. GEICO did not correct the substance of the May 1 account, state that the survey/posting modification remained under consideration, identify a possible case-by-case exception, or provide Plaintiff actionable application access before his May 12 resignation.

69. The eleven days of silence were material because the email documented a categorical denial of the only accommodation Plaintiff believed would address the identified application barrier. If GEICO disagreed, a simple substantive correction would have prevented Plaintiff from reasonably relying on that understanding.

70. GEICO later characterized the matter as delay, continued information-gathering, and Plaintiff's impatience. Plaintiff alleges that 'we need time to evaluate' and 'we cannot waive this metric' are different positions, and that GEICO's later framing changed the question.

**G. Coaching, Forms, and the Post-Resignation Internal Answer Did Not Address the Request**

71. Coaching had helped Plaintiff while learning the job, but it could not cure involuntary tics, pressured speech, mood instability, or already accrued survey history. It also could not remove the survey prerequisite from the internal application gateway.

72. If coaching enabled Plaintiff to perform the current role, it supported qualification; if it did not address the identified application barrier, it was not an effective accommodation for that barrier. GEICO could not answer a posting-process request solely with current-role coaching.

73. GEICO later argued that the psychiatrist's recommendation would not help Plaintiff perform his existing job. That was the stated limit, not a defect: the recommendation preserved current-job standards and addressed positions Plaintiff desired. Title I covers application procedures and defines qualification by reference to a position held or desired. 42 U.S.C. §§ 12111(8), 12112(a).

74. GEICO did not request Plaintiff's resume, assess the requirements of identified vacancies, compare his qualifications to those positions, decide whether the survey prerequisite was job-related to them, identify an effective alternative, or conduct an undue-hardship analysis.

75. GEICO's internal email chain likewise addressed ordinary rules rather than an ADA exception. On May 1, a leave specialist asked whether Plaintiff could post above his level; she followed up on May 9. At 2:18 p.m. on May 12—about three hours after Plaintiff resigned—an internal recipient answered that Plaintiff was not believed restricted 'beyond the normal prerequisites' and apologized for the delay.

76. The phrase 'beyond the normal prerequisites' preserved the precise prerequisite Plaintiff asked GEICO to modify. The answer came too late to provide access while he remained employed and did not decide whether an ADA exception to the normal prerequisite was reasonable.

77. GEICO later faulted Plaintiff for not applying. Plaintiff alleges that defense is circular: Mia allegedly told him not to submit applications that the unmodified prerequisite would automatically block, and HR said the prerequisite could not be waived for posting. A formal application was futile under the rule GEICO communicated.

78. Plaintiff sought access to compete, not a favorable selection decision. GEICO remained free to reject him for a lawful, role-specific reason after permitting access to apply.

**H. Two Independent Uses of the Survey Practice**

79. The first challenged use occurred in Plaintiff's current role through the combined operation of five features: subjective customer ratings; an excellent-only rule and approximately 77-percent threshold; surveys comprising approximately half of the total rating; no meaningful appeal or bias review; and rolling termination reviews affecting the bottom 10 to 25 percent approximately every six months.

80. For this theory, Plaintiff challenges the five features as one inseparable composite practice. He does not ask the Court to decide whether any single feature, or a hypothetical system with one feature removed, would alone create an unlawful disparate impact.

81. The composite practice allowed customer reactions to disability-linked presentation to enter GEICO's rating system, magnified those reactions through the excellent-only rule and fifty-percent weight, prevented correction, and attached ranking, discipline, and recurring job-loss consequences.

82. Plaintiff does not challenge legitimate measurement of actual service. He alleges that a customer's adverse reaction to disability, as distinct from deficient service, is not legitimate performance, and that GEICO made unreviewed customer bias part of its own employment criterion.

83. The second, independent use occurred when GEICO exported the survey-derived result into the application process for materially different jobs. Even if some use were valid in the call center, that would not establish job-relatedness and business necessity for each position Plaintiff desired.

84. The separate screen excluded Plaintiff before role-specific consideration after GEICO received medical documentation connecting survey fluctuations to disability-related communication manifestations.

85. GEICO's assertion that disabled workers can be held to legitimate standards does not resolve either use. Plaintiff seeks neither inflated ratings nor immunity from lawful standards; he challenges the composition of the current-role criterion and its separate carryover into unrelated job applications.

86. Customer-sourced rating systems are not categorically beyond disparate-impact analysis. Liu v. Uber Technologies, Inc., Nos. 22-16507 & 22-16712, 2024 WL 3102801, at *1–5 (9th Cir. June 24, 2024), rejected the evidence pleaded there but analyzed whether customer bias could operate through an employer's rating system. Here, Plaintiff identifies a GEICO-specific mechanism, individualized medical nexus, comments, call recordings, and employer-controlled statistics available in discovery.

**I. Medical Deterioration and Constructive Discharge**

87. Plaintiff's condition worsened after the accommodation response, lower-paid channeling, Danny's meeting, performance escalation, the categorical denial, and the failure to clarify or provide an effective accommodation.

88. By May 12, 2025, Plaintiff was experiencing severe insomnia, manic and depressive symptoms, suicidal thoughts, and symptoms he recognized from his history as pre-psychotic. He reasonably feared that continued exposure would lead to psychosis, hospitalization, or destruction of family relationships.

89. Plaintiff had exhausted the FMLA leave available to him. GEICO's final pay statement recorded zero sick, vacation, and floating-holiday balances, and GEICO had eliminated

separate personal time. He had no remaining temporary means to escape or recover from worsening symptoms.

90. GEICO required unscheduled bathroom breaks to be charged against sick or vacation time or treated as an attendance occurrence. Plaintiff had previously defecated in his clothing rather than incur discipline. With leave exhausted and balances at zero, each additional shift presented a recurring choice between remaining on the phones through an urgent bodily need and risking attendance discipline.

91. The combined psychiatric deterioration, exhausted leave, bodily-function consequences, hostility, announced job jeopardy, and closed application route made another shift under the existing unaccommodated conditions physically and psychiatrically unsafe. This was an acute inability to continue in those conditions, not a permanent inability to work or interact with customers.

92. Plaintiff resigned effective immediately on May 12. His letter opened by stating that GEICO had destroyed his mental health and that he had to resign 'due to being provided no meaningful accommodation or interactive process.' It expressly stated: 'I consider my resignation a constructive discharge.'

93. The letter explained that GEICO's metrics and rolling terminations, benefit reductions, office-presence requirements, eliminated personal time, bathroom-break rule, removal of off-phone mental-health discussion time, and other practices had exacerbated his condition. Those criticisms were part of his disability-based explanation, not unrelated background dissatisfaction.

94. When Plaintiff resigned, Danny allegedly said, 'I was expecting this.' Once departure was assured, Danny became cordial, agreed to serve as a reference, and agreed that preventing a

worker with a Master's degree from competing for other jobs based on a disability-affected call-center metric made no sense.

**J. Protected Resignation-Letter Opposition and VEC Reporting**

95. Plaintiff engaged in protected ADA activity by requesting accommodation, submitting medical documentation, participating in the process, memorializing the denial on May 1, and opposing disability discrimination in his May 12 resignation letter.

96. The resignation letter was protected opposition because it accused GEICO of providing no meaningful accommodation or interactive process, described disability-related harm, and asserted constructive discharge.

97. GEICO had actual knowledge of the letter. Its SIDES response said Plaintiff gave same-day notice to management and answered yes when asked whether he supplied a written resignation. The form instructed the employer to provide the letter, but the response identified no attachment.

98. On May 23, 2025 at 1:28:42 p.m. and May 29, 2025 at 10:17:08 a.m., GEICO or its administrator transmitted two SIDES responses under Request ID 4001787 with different confirmation numbers, 161516171 and 161774973.

99. The later response changed post-claim wages from zero to $361 and supplied thirteen hours, but left blank the field asking why the response was amended. It repeated the disputed separation narrative, left material contradictions uncorrected, and again attached no resignation letter.

100. The responses identified TALX UCM Services, Inc. as third-party administrator, Lora Perry as preparer, and an Equifax email address. Plaintiff alleges that GEICO supplied, authorized,

adopted, ratified, or caused the challenged statements. The GEICO–TALX–Equifax information chain is within those entities' control.

101. The challenged act was not participation in unemployment proceedings or a good-faith disagreement over benefits. It was the alleged retaliatory manner of participation: replacing the protected ADA explanation in the document that stated Plaintiff's reason for leaving while withholding that document after acknowledging it.

102. The response attributed job dissatisfaction or an ordinary voluntary quit to Plaintiff even though his letter expressly cited no meaningful accommodation, no meaningful interactive process, disability-related harm, and constructive discharge.

103. It stated or implied that Plaintiff took no action to preserve employment despite his accommodation request, psychiatrist's letter, HR meeting, May 1 memorialization, and effort to seek non-call-center work. On information and belief, the form also checked yes that he took action while its narrative said he did nothing.

104. It identified May 7 rather than May 12 as the last day worked; stated his job was not in jeopardy despite the announced June termination risk; and answered 'No Change' to a hiring-agreement question despite removal of profit sharing, which Plaintiff alleges formed part of his compensation arrangement and was identified in the resignation letter.

105. It also omitted policy changes that Plaintiff said contributed to leaving, including benefit reductions, office-presence changes, bathroom-break consequences, eliminated personal time, and removed off-phone mental-health discussion time. Plaintiff does not claim each policy independently violated the ADA; he alleges that the categorical answer sanitized what GEICO knew he had stated.

106. GEICO later stated in its Position Statement: 'Simply because Mr. Hickey views his resignation as constructive discharge does not make it so, nor is GEICO required to argue Mr. Hickey's case to the VEC on his behalf.' Plaintiff does not claim GEICO had to accept his legal conclusion or advocate for benefits. SIDES asked what reason he gave and requested the written resignation; accurately transmitting that historical fact was not advocacy.

107. The defense therefore does not answer the allegation. It supports an inference that GEICO treated a complete account as 'arguing' Plaintiff's case and chose a self-serving replacement rather than reporting the requested fact.

108. Causation is content-specific, not merely temporal. The protected act accused GEICO of ADA violations; eleven days later, the challenged report purported to state why Plaintiff resigned while erasing those accusations, acknowledged the source document, and withheld it. The amended transmission repeated the choice after an opportunity to correct it.

109. Plaintiff alleges that the protected ADA opposition was a but-for cause of the selective omission and replacement. He does not allege that the transmissions retaliated for the later-filed EEOC charge.

110. If GEICO read the resignation letter, it knowingly misstated Plaintiff's expressed reason; if it did not, it asserted a reason with reckless disregard while acknowledging and withholding the primary document the form requested.

## IV. CLAIMS FOR RELIEF

### COUNT I — ADA FAILURE TO ACCOMMODATE OR MODIFY POLICY; DENIAL OF EQUAL APPLICATION ACCESS

111. Plaintiff incorporates paragraphs 1 through 110.

112. Plaintiff was a qualified individual with an actual disability. GEICO knew of the disability and limitations through leave records, disclosures, the accommodation request, the treating psychiatrist's documentation, and communications with management and HR.

113. Plaintiff requested a reasonable modification of the survey/posting barrier so that disability-affected customer-survey results would not automatically bar applications for non-call-center positions where the metric was not job-related.

114. GEICO allegedly treated the requested modification as categorically unavailable, offered ineffective current-role coaching, required a mismatched form, and failed to evaluate identified vacancies, Plaintiff's qualifications, case-by-case exceptions, role-specific job requirements, effective alternatives, or undue hardship.

115. The failure to interact matters because it prevented identification and implementation of the requested effective modification or another effective means of equal application access. See Jacobs v. N.C. Administrative Office of the Courts, 780 F.3d 562, 581 (4th Cir. 2015); Reyazuddin v. Montgomery County, 789 F.3d 407, 414–19 (4th Cir. 2015).

116. GEICO violated 42 U.S.C. §§ 12112(a), 12112(b)(5)(A), and 12112(b)(5)(B). Plaintiff suffered lost opportunities, wages and benefits, worsening symptoms, emotional distress, constructive discharge, and other legally available damages and equitable relief.

## COUNT II — ADA UNLAWFUL QUALIFICATION STANDARD AND DISABILITY SCREEN-OUT

117. Plaintiff incorporates paragraphs 1 through 110.

118. GEICO separately used the survey-derived rating and related performance prerequisite as a qualification standard governing access to applications and advancement for materially different positions.

119. The criterion screened out or tended to screen out Plaintiff because bipolar manifestations affected customer perception and survey results. GEICO did not establish that the criterion was job-related and consistent with business necessity for each desired position or that Plaintiff could not be accommodated through a case-by-case exception or application-process modification.

120. This claim does not require invalidating every use of surveys in Plaintiff's current role. It challenges GEICO's separate use of that result as an automatic cross-job gateway.

121. GEICO violated 42 U.S.C. § 12112(b)(6) and 29 C.F.R. § 1630.10. Plaintiff seeks declaratory, injunctive, back-pay, and other make-whole relief legally available for this claim.

## COUNT III — ADA DISPARATE IMPACT: CURRENT-ROLE CUSTOMER BIAS AND CROSS-JOB SCREEN-OUT

122. Plaintiff incorporates paragraphs 1 through 110.

123. GEICO maintained the facially neutral five-factor composite. Within it, the absence of meaningful appeal or bias review was the operative transmission mechanism: even when a customer's comment or stated reason openly revealed disability bias rather than deficient service, GEICO provided no way to remove, correct, or neutralize the survey and treated it as valid performance data.

124. The other four features supplied the subjective input, excellent-only failure rule, approximately fifty-percent weight, and recurring employment consequence. Together, the five features gave uncorrected disability-sensitive customer reactions employment force and tended to disadvantage workers whose disabilities affect communication or customer perception. Plaintiff takes no position on a system with a factor removed.

125. GEICO separately exported the result into materially different applications without establishing position-specific job relatedness and business necessity, screening Plaintiff out before qualification review.

126. The uses caused distinct injuries and are pleaded independently and alternatively. Plaintiff does not represent a class pro se.

127. GEICO violated 42 U.S.C. §§ 12112(a), 12112(b)(3)(A), and 12112(b)(6), and 29 C.F.R. § 1630.10. Plaintiff seeks the declaratory, injunctive, back-pay, and other make-whole relief available for this Count.

**COUNT IV — ADA INTENTIONAL DISCRIMINATION, DISPARATE TREATMENT, AND STEREOTYPE-BASED CLASSIFICATION**

128. Plaintiff incorporates paragraphs 1 through 110.

129. Although GEICO allowed case-by-case exceptions, it allegedly treated Plaintiff's medically supported exception as categorically unavailable, instructed him not to apply, and redirected him toward materially lower-paid work.

130. Discriminatory intent is supported by the alleged physical-versus-psychiatric distinction, Danny's black-hair analogy and lay rejection of the disability nexus, his global disqualification of Plaintiff from customer-interaction roles, Melissa's autism-related remark, GEICO's failure to engage the psychiatrist's later nexus, and its refusal of role-specific assessment.

131. GEICO's later 'unable to interact with customers' characterization repeated the same stereotype by converting episodic effects on a survey instrument into global incapacity.

132. GEICO allegedly acted on those assumptions by limiting application access, channeling Plaintiff toward lower-paid work, escalating performance action, and preserving the survey

barrier. Count IV addresses action because of disability; Count V separately addresses action because of protected activity.

133. GEICO violated 42 U.S.C. §§ 12112(a) and 12112(b)(1). Plaintiff suffered lost opportunities, wages and benefits, worsening symptoms, emotional distress, constructive discharge, and other legally available relief.

## COUNT V — ADA RETALIATION: WORKPLACE CONDUCT AND MATERIALLY FALSE OR MISLEADING VEC REPORTING

134. Plaintiff incorporates paragraphs 1 through 110.

135. Plaintiff engaged in protected activity known to GEICO by requesting accommodation, providing medical support, participating in the process, memorializing the denial, and opposing disability discrimination in his resignation letter.

136. After the request, GEICO allegedly shifted from identifying openings to instructing Plaintiff not to apply, pressured him toward demotion or resignation, told him to assume denial, warned of termination, and escalated performance action. Timing, knowledge, linkage to the pending request, and the abrupt change support but-for causation.

137. For the VEC branch, the specific protected act was the May 12 resignation letter. The May 23 and May 29 reports allegedly concealed and replaced the letter's protected ADA explanation while acknowledging the source document and refusing to attach it.

138. A reasonable worker could be dissuaded from seeking accommodation or opposing discrimination if the employer responded by restricting applications, pressuring departure, or rewriting protected opposition before a state agency. See Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006); Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997).

139. GEICO violated 42 U.S.C. § 12203(a). Plaintiff seeks the equitable and make-whole remedies legally available for ADA retaliation, including back pay, front pay where appropriate, injunctive relief, and correction of materially false separation records; he does not seek compensatory or punitive damages solely under this Count.

**COUNT VI — ADA HOSTILE WORK ENVIRONMENT AND DISABILITY HARASSMENT**

140. Plaintiff incorporates paragraphs 1 through 110.

141. Plaintiff alleges the conduct in paragraphs 47 through 61 and 66 was unwelcome and disability-based. It followed a known, pending accommodation request and specifically attacked its medical nexus and disability manifestations, supporting a direct response to his ADA request rather than ordinary coaching.

142. Pressure toward inferior work or resignation, gun-to-head and black-hair remarks, announced termination, performance escalation, physical-versus-psychiatric distinction, and the autism remark support discriminatory and retaliatory animus and knowing or reckless indifference to ADA rights.

143. Management authority over applications, discipline, and continued employment gave the conduct practical force. The Danny meeting caused an immediate flare-up and logoff; the sequence contributed to deterioration and inability to safely continue. Plaintiff subjectively perceived abuse, and the cumulative humiliation, threats, and work interference were objectively severe or pervasive to a reasonable employee.

144. Supervisory and HR participation and failure to correct the memorialized conduct impute it to GEICO. Plaintiff suffered worsening symptoms, lost wages and benefits, constructive discharge, and other legally available relief.

## COUNT VII — ADA DISCRIMINATION AND RETALIATION RESULTING IN CONSTRUCTIVE DISCHARGE

145. Plaintiff incorporates paragraphs 1 through 110.

146. Constructive discharge is pleaded as the adverse action caused by the disability discrimination and retaliation alleged above, not a freestanding tort. GEICO allegedly closed application access, pressed unaffordable lower-paid work or resignation, announced June termination, escalated performance action, and provided no effective internal route.

147. By May 12, the conditions in paragraphs 87 through 91 included severe psychiatric deterioration, suicidal and pre-psychotic symptoms, exhausted FMLA, zero paid leave, eliminated personal time, and the bodily-function-versus-discipline dilemma. Plaintiff alleges another shift was physically and psychiatrically unsafe.

148. This was not ordinary dissatisfaction. Without leave, Plaintiff faced medically deteriorating conditions and announced termination, unaffordable lower-paid work, or resignation. A reasonable person in his position would have felt compelled to resign; GEICO need not have intended that result.

149. Plaintiff resigned on May 12 because of those conditions. His contemporaneous letter identified no meaningful accommodation or interactive process, destruction of mental health, and constructive discharge. This acute inability to continue was not permanent inability to work or perform other positions.

## COUNT VIII — ADA INTERFERENCE, COERCION, INTIMIDATION, OR THREATS

150. Plaintiff incorporates paragraphs 1 through 110.

151. Plaintiff exercised ADA rights by requesting accommodation, participating in the interactive process, and seeking disability-neutral access to internal applications.

152. While the request was pending, GEICO allegedly instructed Plaintiff not to apply through the unmodified gateway and, through Danny, told him to assume denial, pressed resignation or lower-paid work, warned of termination, used the gun-to-your-head and black-hair comments, threatened memoranda, and escalated discipline.

153. The conduct was objectively reasonably likely to cause Plaintiff to abandon or curtail the accommodation and application process, accept inferior work, or resign. GEICO's later categorical denial and preservation of the barrier reinforced that message.

154. GEICO's alleged post-employment effort to erase or replace the protected ADA account in state-agency reporting further obstructed the exercise and vindication of ADA rights.

155. GEICO violated 42 U.S.C. § 12203(b). Plaintiff seeks legally available equitable relief and does not seek compensatory or punitive damages solely under this Count.

## COUNT IX — ADA DISPARATE TREATMENT THROUGH KNOWING ADOPTION OF SURVEYS REVEALING DISABILITY BIAS

156. Plaintiff incorporates paragraphs 1 through 110.

157. This Count is limited to surveys whose customer comment or stated reason, on its face or with the associated recorded call, revealed that an adverse rating arose from disability-linked speech, tone, pace, affect, tics, or psychiatric presentation rather than deficient service.

158. GEICO controlled the surveys, comments, and recorded calls; received medical notice of the relevant communication manifestations; gave surveys approximately half the overall rating; and offered no appeal, correction, neutral review, or disability-bias screening.

159. Plaintiff alleges GEICO nevertheless counted such bias-revealing surveys in ranking, discipline, termination risk, and application access. By knowingly giving a discriminatory

survey employment force, GEICO adopted the revealed bias as its own decision rather than merely receiving a customer opinion.

160. This intentional theory is distinct from Count III. Surveys not shown to reveal a discriminatory reason may support Count III's disparate-impact theories, but do not by themselves establish Count IX. Plaintiff alleges disability was a but-for cause of GEICO's challenged use and resulting limitations. See Gentry v. East West Partners Club Management Co., 816 F.3d 228, 234–36 (4th Cir. 2016).

161. GEICO violated 42 U.S.C. §§ 12112(a) and 12112(b)(1). Plaintiff suffered lost employment and advancement opportunities, wages and benefits, emotional distress, worsening symptoms, constructive discharge, and other legally available relief.

**COUNT X — VHRA DISABILITY DISCRIMINATION AND DENIAL OF EMPLOYMENT OPPORTUNITIES**

162. Plaintiff incorporates paragraphs 1 through 110.

163. Plaintiff was an otherwise qualified employee with a disability, and GEICO was a covered employer under the VHRA.

164. GEICO allegedly limited or classified Plaintiff because of disability by using the disability-affected survey prerequisite as an application barrier, instructing him not to apply, refusing individualized consideration, and converting disability-linked customer reactions into discipline, termination risk, and denial of advancement access.

165. Disability was at least a motivating factor in the challenged practices. GEICO violated Va. Code § 2.2-3905(B)(1)(a)–(b) and (6).

166. Plaintiff seeks the compensatory, punitive, equitable, fee, and cost remedies legally available under Va. Code § 2.2-3908, without double recovery.

## COUNT XI — VHRA ACCOMMODATION DENIAL, RETALIATION, AND INTERACTIVE-PROCESS FAILURE

167. Plaintiff incorporates paragraphs 1 through 110.

168. Plaintiff requested a disability-related modification of the survey/posting prerequisite so he could compete for identified non-call-center positions. He did not request guaranteed selection.

169. GEICO allegedly denied or restricted employment and promotion opportunities because accommodation would be required, treated the barrier as categorically non-waivable, and failed to review Plaintiff, the vacancies, or possible exceptions individually.

170. After the accommodation request, GEICO allegedly pressured Plaintiff toward unaffordable demotion or resignation, discouraged applications, relied on disability stereotypes, and escalated performance action tied to the disability-affected metric.

171. GEICO failed to engage timely and in good faith about the modification actually requested or another effective alternative providing equal access to compete.

172. GEICO violated Va. Code § 2.2-3905.1(B)(1)–(3) and (5). Plaintiff seeks the compensatory, punitive, equitable, fee, and cost remedies available under Va. Code § 2.2-3908, without double recovery.

## V. REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in his favor and the following relief:

A. Declaratory relief under the ADA and the VHRA;

B. Back pay, front pay where appropriate, lost benefits and opportunities, interest, and other available make-whole relief;

C. Compensatory and punitive damages to the extent legally available, without double recovery;

D. Equitable relief, including correction of materially false separation records, reconsideration for appropriate opportunities without the challenged barrier, and appropriate survey-bias review, to the extent available;

E. Costs and reasonable attorney's fees where legally available; and

F. Any further relief the Court deems just and proper.

## VI. JURY DEMAND

Plaintiff demands a trial by jury on every issue so triable.

Respectfully submitted,

________________________ | Joseph L. Hickey III

7823 Richfield Road, Springfield, Virginia 22153

Telephone: (571) 800-7982 | Email: hopelikefire1@gmail.com | Plaintiff, pro se

Date: August 24 2026

## LOCAL CIVIL RULE 83.1(N) CERTIFICATION

I declare under penalty of perjury that: (1) No attorney has prepared, or assisted in the preparation of this document.

Joseph L. Hickey III | Name of Pro Se Party (Print or Type)

________________________ | Signature of Pro Se Party

Executed on: August 24 (Date) 2026

## CERTIFICATE OF SERVICE

I certify that on August 24, 2026, I served this First Amended Complaint by certified mail on Defendant's counsel, Yvette V. Gatling and Benjamin P. Constine, Littler Mendelson, P.C., 1800 Tysons Boulevard, Suite 500, Tysons Corner, Virginia 22102.

________________________ | Joseph L. Hickey III